M'CORMICK
v.
MALIN.

---

## M'CORMICK v. MALIN and Others.

The testimony of one witness in chancery, when supported by strong corroborating circumstances, is sufficient to counteract a positive denial in the answer.

A person represented to a legatee from whom he was about to purchase a legacy, that he had been informed by one of the executors of the estate that the legacy was not worth 6,000 dollars, and that it was doubtful whether it was worth 5,000 dollars—which representation was not supported by the fact,—and thereby made on the mind of the legatee an impression which induced him to sell the legacy, worth more than 13,000 dollars, to the person making the misrepresentation for 4,500 dollars. *Held,* that the misrepresentation, even if it were innocently made by mistake, as it took the legatee by surprise, and produced on his mind false impressions injurious to his interest, was a good ground of relief for him in a Court of chancery.

In the relations of principal and agent, attorney and client, &c., equity implies a confidence, and, in all contracts between them to which the confidence extends, requires of the party in whom the trust is reposed, the highest degree of good faith. It rests on him to prove that the contract is, in every respect, equal, fair, and equitable. If he fail in this, it is a case of constructive fraud, and avoids the contract. And this rule in equity is not confined to the confidence incident to those formal relations, but it is applicable to all cases where confidence on the one hand and influence on the other exist—from whatever cause they may spring.

If a legatee, about to sell his legacy, repose a confidence in the buyer as undoubting, and be liable to an influence as powerful, as if the relation of principal and agent existed between them, the contract must be governed by the rule of equity applicable to the relation of principal and agent.

Inadequacy of consideration, in general, is not of itself sufficient to avoid a contract; but when coupled with weakness of mind by whatever cause produced, or with pecuniary distress, or circumstances of fraud, it affords a proper subject of relief in equity.

A treaty respecting an important interest, conducted by two persons of very unequal powers—one with a naturally unsound judgment, rendered still weaker by a long continued habit of intoxication, the other enterprising,

keen, and sagacious in business—the weaker mind trusting in the stronger —that influence increased by pecuniary embarrassment on one side, and pecuniary power on the other, &c.,—and resulting in a contract exhibiting great inadequacy of consideration,—presents a claim to relief which a Court of equity cannot withstand.

Although the seller of such interest (a large legacy) under those disadvantages, after he knew that the purchaser had received its amount, and that the same greatly exceeded the price paid for it, may have stated that the purchase was fair, or may have even solemnly confirmed it,—still his right to object to the sale would not be thereby affected, unless, previously to such statement or confirmation, he had been freed from every delusive impression and undue influence under which the sale was made, and had become aware that he could set it aside.

The seller of the legacy in such case having received a tract of land in part payment, filed a bill in chancery against the purchaser, complaining of fraud, &c., but did not offer, as he should have done, to reconvey the land and rescind the contract, &c. The bill was answered and the cause submitted on the merits. *Held,* that the defendant, not having objected to the bill in time, was bound to abide the issue, &c.

ERROR to the *Switzerland* Circuit Court.

DEWEY, J.—This was a suit in chancery by *John M'Cormick* against *Joseph Malin* and others.

The bill of complaint and amendment thereof, stripped of superfluous matter, state in effect as follows, viz.

*James Ferguson,* late of *Maryland,* deceased, by his last will and testament, bequeathed to the complainant a portion of a very large estate—which portion the complainant believed amounted to a sum between 14,000 and 20,000 dollars, on the final settlement of the estate. *John Kennedy, Hugh Kennedy,* and *John M'Curdy* were the executors.

The complainant had impaired the faculties of his mind, and disqualified himself for the transaction of business, by habitual intemperance. *Malin,* having procured intelligence of the situation and expectations of the complainant, with the intention of defrauding him of his legacy, proposed to sell him a tract of land. The terms of a bargain were agreed upon and reduced to writing, by which the complainant was to pay *Malin* 3,100 dollars for the land in ten days at *Hagerstown, Maryland,* to which place *Malin* was to attend the complainant; and if the money was not paid, *Malin* was to be compensated for his time and expenses. It was the understanding of the parties, that *Malin* should act as the agent and confidential friend of the complainant, and

assist him in inquiring into and enforcing his rights. The parties started in company from *Vevay* in this state. The complainant was intoxicated when they set off, and was in the same state during their whole stay at *Hagerstown*, with the exception of a short time immediately after their arrival. Instead of assisting the complainant in accomplishing the object of his journey, *Malin* threw obstacles in his way. After a stay of four days, as the complainant was informed, *Malin* compelled him to leave *Hagerstown*. They returned to *Vevay* together, the complainant being drunk nearly all the way back, and remaining so one day after their arrival at that village, before the complainant returned to his own residence, a few miles distant. The complainant was so much intoxicated when he left *Hagerstown*, that he did not know the reason of his returning home. *Malin* professed at *Hagerstown* to the complainant and others to be his friend, and declared his intention of taking care of him and protecting his rights. During his stay at *Hagerstown*, with the exception of a short period at the beginning, the complainant was too drunk to have a distinct knowledge of any thing that happened; and while he was in that state *Malin* ascertained the value of his legacy, which he had supposed to be considerable until convinced to the contrary by *Malin*. While the complainant remained in *Vevay*, *Malin*, with the intention of alarming him and his creditors, stated publicly and repeatedly that he was not so rich as he thought himself to be; that his legacy was not worth more than 4,000 dollars; and that he, *Malin*, would rescind the contract for the land. By these means he induced one *Whitmore* to rescind a contract with the complainant for some land, for which complainant was to pay 500 dollars. But the more effectually to secure the confidence of the complainant, *Malin* declared in the presence of several persons—some of them belonging to the family of the complainant—and with the view that the declaration should be repeated to him, that had it not been for *Malin*, the people of *Hagerstown* and *James Ferguson's* executors would have cheated the complainant out of 3,000 or 4,000 dollars, but he, *Malin*, would not permit them to do so. *Malin* also made the same remark to the complainant. The complainant went from *Vevay* home, drunk, and

continued drinking there a day or two. While he was yet stupid from the effects of intoxication, being alarmed by the reports which he had heard, he addressed a letter to *Malin* stating in substance that if he gave *Malin* an irrevocable power of attorney, (with the nature of which he was unacquainted,) which *Malin* had previously desired of him, for the purpose of collecting the legacy due him from *Ferguson's* estate, the complainant expected *Malin* to give him a warranty deed for the land respecting which they had contracted; and in that event the complainant would allow *Malin* ten *per cent.* interest, and would make him a present of 500 dollars for his trouble. *Malin*, on the receipt of this letter, became angry, and immediately repaired to the residence of the complainant, where, by exciting his fears on account of his debts and by false representations, he induced the complainant to sell him the legacy for 4,500 dollars, which sum was made to the complainant by the price of the land in regard to which the parties had previously contracted —3,100 dollars, by the debts of the complainant paid or assumed by *Malin*, and by the assignment of notes. The false representations were that *Malin*, when he was at *Hagerstown*, had inquired of *M'Curdy*, one of the executors of *Ferguson*, whether the complainant's legacy was worth 8,000 dollars? 7,000 dollars? 6,000 dollars? 5,000 dollars? and had successively received a negative answer until he came to the lowest sum, 5,000 dollars, with regard to which the executor had answered that it was doubtful. The above contract was carried into execution, by the complainant's executing to *Malin* an irrevocable power of attorney to collect the legacy for his own use, and by *Malin's* giving the complainant a deed for the land. The complainant was confiding in his disposition, easily imposed on, and imbecile from his habit of intoxication. *Malin* was a man of superior capacity, and of great sagacity in the transaction of business. He had, before the final bargain was made, repeatedly stated to others besides the complainant, the same conversation as having passed between him and *M'Curdy*, which he represented to the complainant to induce him to make the contract, and also that the complainant could not realize his legacy under two years, and that

the executors would cheat him out of it. *Malin* used arti-
fice to gain the confidence of the complainant. He knew
the value of the legacy at the time of the contract, but the
complainant did not. He knew it was worth about 14,000
dollars, and in a short time actually received near that sum
for it.

The bill charges the other defendants with being interested
in the contract, and with fraudulent practices.

The prayer is, that the defendants pay to the complainant
the difference between the price of the legacy, 4,500 dollars,
and the sum which *Malin* received in consequence of the
contract, and for general relief.

*Malin*, by his original and amended answer, admits the
truth of the bill as to the last will and testament of *Ferguson*,
the appointment of the executors, and as to the complain-
ant's being a legatee. He admits also the intemperate habit
of the latter, but denies that his faculties were impaired when
he was sober; and insists that he was sober, and in the full
possession of his faculties, in all the transactions which he had
with him. He states that being a dealer in merchandise, and
wishing to extend his business, in the summer of 1834, he
applied to the complainant for the loan of 3,000 dollars. The
complainant agreed to accommodate him if he could get his
legacy at *Hagerstown*. The debt was to be secured by a
mortgage of the land named in the bill. The complainant
and *Malin* were to go to *Hagerstown* for the money. If
they succeeded in getting it, the latter was to proceed to
*Baltimore* to purchase goods; if they failed, the former was
to pay him for his time and the expenses of the journey.
These terms were reduced to writing by a legal adviser; but
when the parties met to sign the papers, the complainant
proposed to buy the land absolutely at 3,100 dollars instead
of making the loan. To this proposition *Malin* reluctantly
acceded, and executed his bond for a conveyance of the
land; to which bond was appended an agreement, that if the
complainant did not pay the money at *Hagerstown*, the bar-
gain was to be rescinded, and he was to pay *Malin* for his
time and expenses in travelling thither. That *Malin* agreed
to be, or was, the agent of the complainant in any sense, or
for any purpose, is expressly denied. *Malin* admits, however,

May Term,
1841.

M'CORMICK
v.
MALIN.

he might have said he was the friend of the complainant and would not see him wronged. This he would have said of any neighbour, but did not recollect that he did say it in respect of the complainant. *Malin* and the complainant, immediately after closing the contract, started for *Hagerstown*, the sole object of the former being to get the money. In that he failed. The parties returned home; the contract was liable to be rescinded; and the complainant became responsible to *Malin* for his time and expenses. The complainant left *Hagerstown* voluntarily, without the exercise, on the part of *Malin*, of any influence over him. *Malin* attempted several times to have the contract rescinded, but the complainant always objected. *Malin*, at one time, proposed to the complainant to let the contract for the sale of the land stand at ten *per cent.* interest on the purchase-money, and to pay the complainant's debts, and wait for the money advanced at a like rate of interest. The complainant refused this offer. Another contract was agreed upon between the parties, under which *Malin* actually commenced the payment of the complainant's debts. This contract the complainant requested might be rescinded, and proposed to sell the legacy to *Malin* for 4,500 dollars at his *Malin's* risk, and on his liability for future expenses. *Malin* was averse to accepting this proposition, thinking its terms were too hazardous, but ultimately closed with it, and purchased the legacy at that price. Under this contract, *Malin* conveyed the land to the complainant at 3,100 dollars, and paid the residue of the price of the legacy to the satisfaction of the complainant. The complainant never requested that this contract might be rescinded, but repeatedly, long afterwards, expressed himself satisfied with it. *Malin* threw no obstacles in the way of the complainant in inquiring into the situation of his business at *Hagerstown;* nor did he himself make any inquiry or examination respecting it at the probate office, or otherwise, excepting that he did inquire of *M'Curdy* what the complainant's claim was worth. *M'Curdy* doubtingly replied that it might be worth 6,000 dollars. He did not tell the complainant that *M'Curdy* doubted its being worth 5,000 dollars. At the time of the purchase of the legacy, he had no information of its value other than that thus derived from

the executor, and had his doubts whether it was worth 5,000 dollars. It was extremely questionable whether 6,000 dollars could be realized from it. It was then entirely uncertain when the business would be closed, and whether it would ever be closed without a law-suit. The complainant had received more than 2,000 dollars in advance towards his legacy, and *Malin* really thought he was paying a high price for it. Nobody supposed it would be worth more than from 4,000 to 6,000 dollars. The property on which the residuary legacy of the complainant was to be raised, consisted of bank and canal stocks, and of land. The value of the legacy depended greatly upon the prices of those stocks, which were to be sold at a distant day. The complainant had in his possession a copy of *Ferguson's* will, had been twice to *Hagerstown* to inquire into his prospects there, and must have known all that could be known of the matter. *Malin* admits he might have said, after his return from *Hagerstown*, that the complainant was not so rich as he imagined; that he would rescind the first contract respecting the land; that he would not stand between the complainant and his creditors; and that his claim was not worth more than 4,000 or 5,000 dollars;—these things he might have said, because such were his opinions, but denies that he said them with any fraudulent intent, and asserts that he has no recollection of saying them or any of them; denies that he operated, or attempted to operate, upon the fears of the complainant or his creditors. He did speak to *Whitmore* about rescinding a contract with the complainant for some land, for which the complainant was to pay 500 dollars, but he did so at the special request of the complainant, and with a view to promote his interest. *Malin* received from the executors of *Ferguson* 13,144 dollars and 37½ cents, the balance of the legacy which he had purchased, after deducting about 2,000 dollars which had been advanced to the complainant, but had to pay from the sum received 25 dollars for certain charges. While the complainant and *Malin* were at *Hagerstown*, the former offered to sell his legacy for half of what he supposed it to be worth, alleging as a reason for the offer, that he wished to retain the land for which he had contracted with *Malin*. The complainant was sober at *Hagerstown* one

or two days, and had full opportunity to ascertain the value of the legacy. The answer repeats the denial of the mental imbecility of the complainant, and alleges that *Malin* exercised no undue influence over him; denies that *Malin* made any false representation to the complainant, and that he was deceived at all, but insists that the whole transaction was perfectly fair, and perfectly understood by the complainant. *Malin* denies that the other defendants had any interest or concern in any of his transactions with the complainant, or acted any part in the same.

The other defendants by their answers disclaim all interest in, or connection with, the matters set out in the bill.

The Circuit Court, on final hearing, dismissed the bill at the costs of the complainant. He has appealed to this Court.

The evidence in this cause is very voluminous, and not a little complicated. The material facts, however, established by the pleadings and the testimony are as follows, viz.

*James Ferguson*, late of *Hagerstown, Maryland*, by his last will and testament, after bequeathing specific pecuniary legacies to the amount of 14,500 dollars, and making devises of three and a half sections of land, made the children of his sister, *Mary M'Cormick*, his residuary legatees. The complainant, being one of her children, became entitled to one seventh part of the *residuum* of the estate. *John Kennedy*, *Hugh Kennedy*, and *John M'Curdy* were appointed executors, and directed by the will to sell the residuary estate, (which consisted principally of bank stock,) and make distribution within four years. Probate of the will was made on the 27th of *March*, 1832.

In 1833, the complainant visited *Hagerstown*, and satisfied himself that his legacy would amount to about 18,000 dollars. In the autumn of 1834, *Malin* applied to the complainant for the loan of 3,000 dollars on mortgage-security of a certain tract of land. The complainant agreed to accommodate him, provided he could get his legacy of the executors at *Hagerstown*, to which place *Malin* was to accompany him for the purpose of receiving the money. If he got it, he was to proceed to *Baltimore* on his own business; if he failed, he was to be paid for his time and expenses on the journey. This negotiation was not carried into effect, but terminated

on or about the 6th of *November*, 1834, in a contract for the absolute sale of the land by *Malin* to the complainant at the price of 3,100 dollars, which the latter was to pay. in ten days at *Hagerstown* should he realize his legacy; if not, the contract was to be- rescinded, and *Malin* paid for his time and expenses as before stated. The purchase was made on the proposition of the complainant, who preferred it to loaning the money. There was no undertaking on the part of *Malin* to act as the agent or confidential friend of the complainant in the management of his business at *Hagerstown*.

Very soon after the contract was closed, the parties set out from *Vevay* in this state, where *Malin* resided, for *Hagerstown*. They arrived there about the 15th of *November*. The executors were not prepared to pay the legacy. *Malin* and the complainant remained at *Hagerstown* four or five days, during the whole of which period, excepting the day of their arrival, which was *Sunday*, and the succeeding *Monday*, the complainant was very drunk. *Malin* expressed solicitude for his situation, declared he was bound to see him safe home, and waited two days for him to get sober enough to travel. They returned to *Vevay*, probably, on the 28th of *November*. The complainant was intoxicated during the whole return journey, and remained in the same situation two or three days after his arrival at *Vevay*, before he went to his own residence, a few miles distant. He continued drinking a day or two after he got home.

While *Malin* was at *Hagerstown* he was informed by one of the executors of *Ferguson*, *M'Curdy*, that he designed to go to *Baltimore* in ten days, for the purpose of selling the bank stock belonging to the estate, and assured him that he should be informed by a letter, within six weeks, at what time the complainant would be able to get his legacy, and what would be its amount. This information and assurance the executor gave to *Malin* in consequence of the contract which subsisted between him and the complainant for the land, and explained his reasons for doing so at the time. The complainant was also informed by *M'Curdy* of his intended journey to *Baltimore* to sell the stocks, and received the same promise to let him know the result, which had been made to *Malin*. *Malin* made an attempt to draw from

*M'Curdy* information as to the value of the legacy. The particulars of the testimony on this point will be hereafter stated. Before *Malin* left *Hagerstown*, he declared that as the executors had refused to buy the complainant's interest in the estate, he would do it; and that he knew a person who would purchase it if he did not. The situation of *Ferguson's* estate was pretty well understood at *Hagerstown*, where there was a general impression that a residuary share was worth from 12,000 to 15,000 dollars. At the time *Malin* expressed his determination to buy the legacy, he was told by the father of some of the residuary legatees residing in *Hagerstown* that it was worth at least 10,000 dollars.

Immediately after the return of the parties from *Hagerstown* to *Vevay*, *Malin* spread a report through that village and its neighbourhood, strongly calculated to induce the complainant to apprehend, if not actually believe, that his legacy was not worth more than 4,000 or 5,000 dollars, and could not be realized short of eighteen months. He also instilled into his mind a most unjust suspicion of the fair and honourable intentions of the executors towards him. The complainant placed almost unbounded confidence in *Malin*, and was greatly under his influence. He experienced, too, considerable uneasiness on account of his debts. The natural traits of his mind were instability of purpose, and unsoundness of judgment—defects which were much increased by his long continued habit of intemperance; and though his mental imbecility, when sober, fell a good deal short of legal incapacity, he was far from being a match in a matter of trade for *Malin*, who in business transactions possessed no inconsiderable share of sagacity. It is due to the latter to state that his general character appears to be that of an honest and honourable man.

Under these circumstances, after several interviews and various modifications of their contracts, the parties, on the 6th of *December*, 1834, concluded their final bargain. *Malin* purchased the legacy for 4,500 dollars, and received an irrevocable power of attorney to collect it for his own use; he executed to the complainant a deed for the land at the price of 3,100 dollars, and made up the balance by paying the complainant's debts and by the assignment of notes to him.

In the several attempted contracts, and in that which was finally closed, the proposition to sell the legacy always came from the complainant, and when he was sober. At the time of executing the papers, which was one day after the bargain was struck, the complainant declared his belief that the transaction would be profitable to *Malin*, and that he would make several thousand dollars by it.

On the 25th of *March*, 1835, *Malin* received of the executors, under the power of attorney, 13,144 dollars and 37½ cents, being the balance due on the legacy after deducting 2,006 dollars previously advanced to the complainant. The sum received by *Malin* was, however, subject to a deduction of 25 dollars for costs and other charges. After *Malin* had received the money, the complainant with knowledge of the amount, repeatedly declared that the contract was fair, that he had been honourably treated by *Malin*, and that he was glad the latter had made a good bargain. On one of these occasions he remarked, that *Malin* had realized from the legacy twice as much as he himself could have obtained, had he kept the management of the matter in his own hands. And one of the declarations that he was satisfied with the conduct of *Malin* was made as late as *June*, 1835, at which time he actually contemplated bringing this suit; and he had previously, on the 25th of *May*, in a letter to a friend at *Hagerstown*, made the most bitter complaints of *Malin*, charging him with fraud and "robbery." After the commencement of the suit, on two different occasions during a term of the Circuit Court, he stated that he did not expect to succeed; that he had been induced to exhibit his bill for the purpose of procuring a compromise; and he requested a person to propose to *Malin* to give him something. He also stated that he joined the other defendants in the suit with *Malin* to prevent them from being witnesses. These declarations were neither confidentially nor privately made. The complainant was sober when he made them, but was intoxicated on the days on which they were made, and terminated the week in a paroxysm of *delirium tremens*. *Malin*, after the purchase of the legacy, sometimes expressed doubts whether the bargain would not be a losing one to him, and once

offered to sell half of his interest for the advance of a suit of clothes worth 100 dollars.

One of the prominent grounds assumed by the bill for relief is, that *Malin* made false representations to the complainant to induce him to enter into the contract, and sell his legacy greatly below its value.

The bill charges that *Malin* represented to the complainant, that *M'Curdy*, one of the executors, assured him that it was doubtful whether the legacy was worth 5,000 dollars, having previously asserted it was not worth 6,000 dollars. The answer denies that *Malin* stated that *M'Curdy* said it was doubtful whether it was worth 5,000 dollars. There was but one witness present at the making of the contract. He deposes that the complainant at first required 8,000 dollars as the price of the legacy, upon which *Malin* said he had inquired of *M'Curdy* as to its value, who answered that it was not worth that sum, and that he made a similar reply to inquiries whether it was worth 7,000 dollars, and 6,000 dollars, but stated it was doubtful whether it was worth 5,000 dollars. The complainant then asked *Malin* whether he would give him 5,000 dollars, and received a negative answer, but to the inquiry whether he would give 4,500 dollars, the reply was in the affirmative, and the bargain was closed; upon which *Malin* requested the complainant to go to *Vevay* the next day and execute the necessary papers. The testimony of this single witness in support of the bill is not, of itself, sufficient to counteract the positive denial of the answer. But there are circumstances so strongly corroborative of his statement, that we are not authorized to disregard it. A multitude of witnesses prove that *Malin* originated a rumour, which spread through *Vevay* and the neighbouring country, that the complainant's legacy was not worth more than 4,000 or 5,000 dollars; and two witnesses depose that he represented to them, that he made substantially the same inquiries of *M'Curdy*, and received from him the same replies in reference to its value, which the witness swears he made to the complainant. If *Malin* was thus free to make such statements to others regarding the affairs of the complainant, we see no reason to doubt the truth of the testimony which affirms he made them to him.

But were it admitted that the complainant had failed to establish the correctness of the particular averment, that *Malin* represented *M'Curdy* as having said it was doubtful whether the legacy was worth 5,000 dollars, it would not materially impair the strength of his cause. The bill also charges, that *Malin* represented that *M'Curdy* told him the legacy was not worth 6,000 dollars. This allegation is not expressly denied by the answer, and is sufficiently established by the testimony of one witness. But *Malin* insists that *M'Curdy* represented to him that it was doubtful whether the legacy was worth the last-named sum. Had *M'Curdy* so stated the matter, it would not have justified the unqualified representation made by *Malin* to the complainant. But the answer is not sustained in this respect by the evidence. *M'Curdy* deposes that, suspecting *Malin* of a design to purchase the legacy, he purposely avoided giving him any definite information of its value; that he did not state any sum; and that if he had seen fit to set a price upon it, he could not have named one less than 12,000 or 13,000 dollars, for such he knew to be its worth. He states that he might have told *Malin*, that its value was uncertain on account of the fluctuating state of the stock market. *Malin* has adduced but one witness on this subject. He deposes that he heard *M'Curdy*, in the presence of one of his clerks of the name of *Rutherford*, tell *Malin* that he would be safe in giving 6,000 dollars for the legacy, but that it was questionable whether it was worth 8,000 dollars. *Rutherford* swears that he heard a conversation between *Malin* and *M'Curdy* when this witness was present; that *M'Curdy* told *Malin* the value of the legacy was uncertain on account of the unsettled state of the market; and that he did not know what it was worth; that he had no recollection of *M'Curdy's* stating any certain value, and that he did not represent it as doubtful whether it was worth 6,000 dollars. Thus the answer, so far as it regards the allegation that *M'Curdy* represented to *Malin* that it was doubtful whether the legacy was worth 6,000 dollars, is not only not sustained by *Malin's* own witness, but is contradicted by him and two others.

But it is contended, that the representations made by *Malin* to the complainant as to *M'Curdy's* opinion of the

May Term,
1841.

M'CORMICK
v.
MALIN.

value of the legacy, allowing them to be false, are immaterial; that they had respect to a matter not affecting the merits of the cause, and to a subject as well understood by the complainant as by *Malin*. We cannot concur in this view. If it be granted that the complainant by inquiry at the proper offices, had formed an opinion nearly correct as to the value of the legacy, and in this respect partook of the general impression which prevailed at *Hagerstown*, that it was worth 12,000 or 15,000 dollars or more, still the positive declaration of an executor, possessing superior means of information, if made to him, that the value did not equal one half of the lowest of those sums, must have staggered his belief, and tended strongly to influence injuriously the terms of the contract he was about to make. The representation of *Malin*, that the executor had made that assertion to him, was calculated to have a still stronger influence upon the mind of the complainant, for he entertained a most unjust suspicion, that *Malin* could effect with the executors what he himself could not, while his confidence in *Malin* was implicit. And surely it cannot be contended, that the complainant was as well informed as *Malin* of what the executor had said to the latter.

The representation, then, made by *Malin* to the complainant at the time the contract was concluded, that one of the executors had asserted that the complainant's legacy was not worth 6,000 dollars, and that it was doubtful whether it was worth 5,000 dollars, not being supported by fact, and having made upon the mind of the complainant an impression which induced him to agree to terms highly injurious to his interest, brings the case within the well established head of equity,—that *suggestio falsi* is a good ground of relief. 1 Story's Eq. 200.—*Broderick* v. *Broderick*, 1 P. Will. 239.— *Evans* v. *Bicknell*, 6 Ves. 173. Even admitting that *Malin* made the misrepresentation innocently by mistake—a supposition that his fair general character, perhaps, renders no more than just to him—this consideration does not prevent the application of the principle. The misrepresentation, nevertheless, took the complainant by surprise, and produced false impressions injurious to his interest. This, too, is a good cause of relief in a court of equity. 1 Story's Eq.

201.—*Turner* v. *Harvey*, Jacob, 169.—2 Br. Ch. R., cited in 1 Story's Eq. 203, n. 6.

We have so far viewed the contract, against which this bill seeks relief, as one entered into by parties standing on equal terms, each at liberty to make the most of superior information, judgment, and sagacity, and bound only to avoid the misrepresentation and concealment of such material facts as would mislead and impose upon the other. But the cause presents other aspects and involves other principles.

In the technical relations—such as principal and agent, client and attorney, &c.—equity implies a confidence, and, in all contracts between them to which the confidence extends, requires of the party in whom the trust is reposed the highest degree of good faith. On him rests the duty of proving, that the contract is in every respect equal, fair, and equitable. If he fails in this, it is a case of constructive fraud and avoids the contract. 1 Story's Eq. 307, 308.—*Gibson* v. *Jeyes*, 6 Ves. 277.—*Selsey* v. *Rhoades*, 2 Sim. & Stu. 41.—*Harris* v. *Tremenheere*, 15 Ves. 34.—*Butler* v. *Haskell*, 4 Desaus. 651.

But this rule of equity is not confined to the confidence incident to the formal relations alluded to; it is applicable to all cases where confidence on the one hand and influence on the other exist, from whatever cause they may spring. In the case of *Griffiths* v. *Robins*, 3 Madd. R. 191, a deed of gift was set aside notwithstanding no technical fiduciary relation subsisted between the parties, because the donor, an aged person, placed great confidence in the donee to whose influence she was liable, and because the latter failed to show that the deed of gift was the result of free will, and effected by the intervention of some indifferent person. In the case of *Revett* v. *Harvey*, 1 Sim. & Stu. 502, a solicitor who had acted as the confidential friend of an infant, advanced money to him for the subsistence of himself and family. After the infant arrived at full age, and had appointed another solicitor, he signed a settled account with the first solicitor acknowledging the sums which he had received of him, and expressing gratitude for his services; upon which the vouchers on which the settlement was based were given up. No fraud or mistake was proved. But the Court decreed

May Term, 1841.

M'CORMICK
v.
MALIN.

the account should be opened, on the ground that the defendant had seen fit to place himself in a relation with the infant which gave him great influence over his mind, and had not shown that when he signed the account he had the assistance of a friend or adviser. The case of *Taylor et al.* v. *Obee*, 3 Price, 83, turns on the same principle. A contract was rescinded after the lapse of seven years, on the ground that a mere confidential friend, instead of advising the person with whom he contracted—an aged female—as an attorney should have advised her, purchased her property himself at great inadequacy of price. Lord *Hardwicke*, in *Fox* v. *Mackreth*, 2 Cox, 327, which was a case between *cestui que trust* and trustee, says, "It is not, therefore, in that view that *Mackreth* being called a trustee can operate; it does not rest on the name of a trustee, or on the legal or equitable relation of trustee, but on the familiar intercourse between him and *Fox*. Now, can I, putting myself in the place of a juryman, pronounce, that *Fox* agreed to the price *trusting that Mackreth knew the price and represented it fairly to him?* If *A.* says to *B.*, I know the value of the subjects, and if you will trust me, I will fairly tell you what it is worth, and *A.* at the same time knows the value to be double what he represents it to be, this is such an abuse of confidence as shall be relieved against; not because *A.* is a trustee, but because he stipulated with *B.* to tell him fairly the value, and he broke that stipulation; and then to be sure it makes full as strong a case as that of a trustee." Similar language is held by Lord *Eldon* in *Gibson* v. *Jeyes, supra.* In reference to the rule that an attorney, in a suit between him and his client, has the *onus* of manifesting that no undue advantage has been taken, his Lordship says, "It is asked, where is that rule to be found? I answer, in that great rule of the Court, that he who bargains in matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying to trustees, attorneys, or any one else."

In the case before us there was no formal relation between the parties of principal and agent, at the time of the sale of the legacy; but the one reposed a confidence in the other as undoubting, and was liable to an influence as powerful, as if

that relation had subsisted. A very short time, not more than a day or two, before that contract was concluded, the parties met and agreed upon the terms of a different bargain. How the conversation in relation to this last matter began, or who commenced it, is not known. But the complainant made a proposition (the only one which he made on that occasion) to sell his legacy to *Malin* for 5,000 dollars. The reasons he assigned for selling were, that he could not get his money of the executors until the spring of 1836; that he had "rascals" to deal with at *Hagerstown;* and that he should be pressed by his creditors. *Malin* objected to purchasing, alleging that the amount of the legacy was uncertain, and that one of the parties would lose by such a contract; and he proposed to let the first contract for the sale of the land stand at the price of 3,100 dollars; that he would pay the complainant's debts; and that for the price of the land, the amount of the debts which he should pay, and his own debt against the complainant, he would wait until the legacy could be got, at ten *per cent.* interest; that the complainant should execute a power of attorney to *Malin* authorizing him to receive the legacy; that he should be paid for expenses while attending to the business, and have 100 dollars per trip for going to *Hagerstown;* and that the complainant should mortgage the land as security for its price. The latter still expressed a desire to sell; but on the advice of *Malin* and another person present, accepted the above propositions, remarking that he would "give *Malin* half over and above." Whether he meant by that expression, that he would give *Malin* one half of the amount which the legacy should exceed 5,000 dollars, or that proportion of its excess over the price of the land and the amount of the debts, the witness did not understand. The contract was not reduced to writing, but it was the understanding of the parties that it should be. The complainant was in depressed spirits on account of his indebtedness. *Malin* took a list of his debts, and actually paid some of them and purchased in others.

This transaction is not the only evidence that *Malin* possessed the confidence of the complainant, and exercised an influence over him. It was by *Malin's* advice that he rescinded a contract, contrary to his own inclination, with

*Whitmore* respecting a tract of land. With regard to this matter, the answer states that *Malin* acted by the request of the complainant in procuring *Whitmore* to rescind this contract; but the proof is otherwise. It was, too, by the assistance of *Malin*, that another creditor of the complainant, who was secured by mortgage, agreed to postpone the payment of his debt two years at ten *per cent.* interest. To this creditor *Malin* stated, in the presence of the complainant, that he would not be able to get his legacy short of eighteen months. When a person friendly to the complainant cautioned him against *Malin*, he was offended, and replied that *Malin* was " a gentleman and a man of business." It is proved that the complainant and his family considered him as a confidential friend; and one witness of intelligence and high respectability deposes, that the complainant appeared to be more influenced in matters of business by *Malin's* opinions than by his own.

It was in reference to the unfinished contract respecting the sale of the land and the agency just alluded to, that the complainant wrote the letter mentioned in the bill, informing *Malin* that as he had required an irrevocable power of attorney to collect the legacy, the complainant requested a deed for the land. It is in proof that the letter was delivered, and that *Malin* immediately repaired to the house of the complainant where the bargain was closed. What were the consultations of the parties, and what their motives for abandoning the prior contract, we are not informed. On the next day the complainant went to *Vevay*, and the parties (the complainant being still unassisted by an indifferent adviser) executed papers which *Malin* had previously caused to be prepared. It is worthy of remark that the power of attorney executed by the complainant, authorizing *Malin* to receive the legacy to his own use, was an instrument which the defendant had procured to be drawn under the other contract, which did not justify a power to appropriate the whole legacy to his own use, but only such part of it as should be adequate to the payment of the price of the land, and what other sums the complainant might be indebted to *Malin*—a circumstance which tends to show that although he had ostensibly agreed to accept an agency, he had not relin-

quished the design to purchase the legacy, which he had formed, or at least expressed at *Hagerstown.*

Under this state of facts, the contract of sale of the legacy by the complainant to *Malin* must be governed by the rule of equity applicable to the relation of principal and agent. That rule is, as we have seen, that the agent, dealing in a matter of advantage with his principal, must show that his conduct has been marked with the highest degree of good faith; that he has concealed nothing, suggested nothing, that would mislead the judgment or prejudice the interest of his employer; in fine, that the confidence reposed in him has not been abused.

It remains to inquire how this duty has been discharged by *Malin* in his dealings with the complainant.

There is great inadequacy of consideration in the contract. *Malin* purchased of the complainant for 4,500 dollars a claim on which, within four months from the date of the bargain, he received more than 13,000 dollars. It may be true, that neither of the parties knew the full value of the legacy; and indeed that its value was somewhat uncertain, as it depended upon the price of stocks. But it is also true, that the interest of the complainant was as valuable at the time of the sale as it was at any period afterwards. The greatest part of the stocks were sold in *Baltimore* just about the date of the contract, and for aught that appears to the contrary, a little before it. The balance of the stocks was sold at *Philadelphia* in *February;* and with regard to this portion of them, no fluctuation in the market was apprehended. The sale of them was purposely delayed a month or two in order to secure the *January* dividends. The uncertainty of the value of the legacy, however, was no reason why *Malin* should withhold from the complainant any information in his possession which might influence the terms of the contract; on the contrary, it was a strong reason why he should communicate such information. He not only did not give all the knowledge which he had on the subject, but he actually misled the complainant as to one important matter, independently of his statement of *M'Curdy's* assertions in reference to the value of the legacy, which has already engaged our attention. It is evident that the *time* of receiving the legacy was a very

material consideration with the complainant. Though by the will of *Ferguson* the executors had, at the period when the parties were at *Hagerstown*, about eighteen months in which to bring the affairs of the estate to a close, yet under the circumstances which existed, there was no propriety in the statements which *Malin* so frequently made, and sometimes in the presence of the complainant, that the latter would not be able to realize his legacy short of that time; for *M'Curdy* had told *Malin* that he designed to go to *Baltimore*, within ten days, for the purpose of selling the stock, and promised him that he would inform him by letter, within six weeks, when the money would be ready for the complainant, and the amount to which he would be entitled. This circumstance *Malin* never mentioned to the complainant or to others, but within three weeks purchased the legacy without a single allusion to that matter, leaving the complainant under the illusion, which *Malin* had himself created, that he would be obliged to wait eighteen months. It is true, that *M'Curdy* made the same communication and promise to the complainant, but it is most manifest that he had entirely forgotten them; nor is it singular that such should be the fact. . He was either drunk when *M'Curdy* gave him the information, or became so the next day, and continued in that state for ten or twelve days, and within two or three days of the time of making the contract. Nothing is more reasonable than to suppose, that this long continued inebriety so benumbed his faculties that his memory but partially performed its office, and that the matter in question had wholly escaped his recollection. But there is no reason to apprehend that *Malin* did not remember it. He had formed the determination to purchase the legacy before he left *Hagerstown*. A man of his shrewdness could not but have perceived the importance of the information which *M'Curdy* had promised, in its bearing upon the terms of the contract which he contemplated; and such a man, under such circumstances, could not have forgotten such a fact. He must have perceived, however, that the matter was not recollected by the complainant, who never made any allusion to the expected sale of the stocks in a short time—a contingency upon which the speedy payment of his legacy depended—on the

various occasions when *Malin* asserted in his presence that eighteen months would intervene. *Malin* had assumed a relation towards the complainant, which rendered it his duty to bring this matter back to his mind. *Malin* had also been informed at *Hagerstown* by the father of some of the residuary legatees, that the complainant's legacy was worth, at least, 10,000 dollars. Good faith required of him, in the circumstances in which he was placed, that this matter should be communicated to the complainant.

There is another feature presented by the testimony. *Malin* had induced the complainant to believe that the executors were dishonest men, disposed to give him trouble about his legacy, and that *Malin*, to use his own language, could better "manage" them than the complainant. There was not the slightest ground for this imputation. But a day or two before the parties started for *Hagerstown*, the complainant, in a letter to them, expressed the fullest confidence in their integrity, and friendly intention towards him, and stated that he was satisfied with the reasons which they had given for not sooner bringing the estate to a close, though, owing to his circumstances, he regretted any delay was necessary. While he was at *Hagerstown*, nothing occurred on the part of the executors calculated to change his feelings or opinions in this respect. Two of the executors were his uncles, and there is nothing in the whole history of the transactions of this cause, which tends in the slightest degree to implicate the fairness of their intentions, or to show unfriendly feelings on their part to the complainant. The other executor, *M'Curdy*, with whom the complainant appears principally to have transacted business, not only refused to purchase the legacy, but most earnestly entreated him not to sell it at all. The complainant had no ground whatever, arising from the conduct of the executors, to suspect their friendship or their integrity, nor did he suspect either until after his return to *Vevay*. After that event, and up to the time of the sale of the legacy, *Malin* cast imputations upon the executors, and induced the complainant to believe that his business with them was not as safe in his own hands, as it would be in those of *Malin*. There could not be a more undeserved censure, nor stronger evidence of the great influ-

May Term, 1841.

M'CORMICK
v.
MALIN.

ence which *Malin* exercised over the mind of the complainant. This unjust impression should never have been made, or being made, it should have been removed before the contract was closed.

There was much testimony, and the opinions of the witnesses varied, as to the capacity of the complainant; and it might be rather difficult to form a satisfactory conclusion on this subject, without the aid derived from his actions on various occasions. But with that aid, it is impossible to believe he did not labour under considerable mental imbecility. We see him on one occasion offering to sell his legacy for 5,000 dollars, and in one or two days afterwards, demanding of the same person to whom he made that offer, and without any change of circumstances, 8,000 dollars. We see him, after the terms of a bargain had been agreed upon, making a senseless offer of a gratuity in addition to those terms. He publicly expressed his satisfaction with the conduct of *Malin* after he had determined to file this bill, and after denouncing him in a private letter in the severest terms of reproach. Subsequently to the commencement of the suit, he declared in a public room that he did not expect to succeed, that he was persuaded by others to the measure, and that his object was to procure a compromise. He had, in about three weeks, forgotten a fact strongly calculated to influence the terms of his contract had it been recollected, and had an impression made upon his mind with regard to the executors, which none but a weak intellect could have received. If other evidence of mental imbecility were wanting, it is to be found in the contract itself.

The complainant was also labouring under much anxiety on account of his debts; and *Malin* held the control of them to a considerable amount in his own hands—a circumstance not a little calculated to increase the influence which, from other causes, the latter had acquired over the former.

Inadequacy of consideration, in general, is not of itself sufficient to avoid a contract; but when coupled with weakness of mind by whatever cause produced, or with pecuniary distress, or circumstances of fraud, it affords a proper subject of relief in equity. *Dunnage* v. *White*, 1 Swanst. 137.—*Clarkson* v. *Hanway*, 2 P. Will. 203.—*Bunch* v. *Hurst*,

3 Desaus. 273.—*Wood* v. *Abrey*, 3 Madd. R. 418.—*Stilwell* v. *Wilkins*, Jac. 280.—*Butler* v. *Haskell, supra.*

If it could be doubted whether any of the views which we have taken of this cause, separately considered, is sufficient to entitle the complainant to relief, the doubt must vanish before their combined force. A treaty respecting an important interest conducted by two persons of very unequal powers, one with a naturally unsound judgment, rendered still weaker by a long continued habit of intoxication, the other enterprising, keen, and sagacious in business—the weaker mind trusting in the stronger—that influence increased by pecuniary embarrassment on one side, and pecuniary power on the other—suggestions of essential matter, perhaps innocently made, but not sustained by fact—other matter equally important improperly withheld—suspicion of difficulty created when no difficulty existed,—and resulting in a contract exhibiting great inadequacy of consideration,—a treaty thus characterized presents a claim to relief which a Court of equity cannot withstand.

Much stress has been laid upon the declaration of the complainant, made about the time when he executed the papers, that he expected *Malin* would make several thousand dollars by the contract. We do not think a declaration of that character, coming from a person of the complainant's cast of mind, is entitled to much weight. But even if he spoke advisedly, and meant what he said, it can be accounted for without materially weakening any view we have taken of the cause. He undoubtedly felt a feverish and foolish anxiety to sell his legacy, and was willing to make a considerable sacrifice rather than be delayed a long time in the reception of his money. One witness indeed testified, that he said at *Hagerstown*, he would sell at half price rather than wait until the estate was settled. It is evident if he did say this, he said it before he was informed by *M'Curdy* that he would attempt to sell the stocks in ten days, or after he had forgotten that he had received such information. When he contracted with *Malin*, he was under the false impressions that he would be delayed by the executors eighteen months, and that *Malin* could better deal with them than he could. Under such impressions, he might have thought that *Malin*

would make several thousand dollars by the trade—and that consistently with the supposition that he was greatly misled by the representation, made by *Malin*, of *M'Curdy's* declarations as to the value of the legacy. If under these false impressions created by *Malin* himself, he believed he should lose several thousand dollars, and was willing to incur the loss rather than encounter the difficulties which he had been improperly made to apprehend, it does not follow that *Malin* ought to retain the enormous advantage which he gained, or any advantage. His gain was the result of the double delusion under which the complainant laboured, as to the value of the legacy, and as to the time when it would be paid.

It has also been urged against the right of the complainant to relief, that he repeatedly declared after he had ascertained the amount of money received by *Malin*, that the conduct of the latter in making the contract was fair and honourable. It should be recollected that these declarations, with one exception, were made when the complainant reposed the same confidence in *Malin*, and retained the same delusive impression as to facts, which induced him to make the contract. He had not then discovered, that *Malin* was mistaken as to the declarations of *M'Curdy* in respect to the value of the legacy. He knew not then, that at the moment of making the contract, there was almost a certainty of getting his money in three or four months. He had not then escaped from the strange delusion, that, to induce the executors to do justice, *Malin* must "manage" them. To one of these very expressions of satisfaction with the conduct of *Malin*, he added the declaration of his belief that *Malin* had realized from the legacy double what he could have done himself, had he not sold it. With regard to the expression of satisfaction which was made after his determination to commence suit, and with regard to those which had reference to his motives and expectations in resorting to that measure, it will hardly be contended that they prove any thing but his folly. If instead of using the expressions alluded to, the complainant had, in the most solemn manner, confirmed the contract, the confirmation would not have been binding upon him, unless every delusive impression and undue influence, which induced to the original transaction, had

been previously removed, and he had become aware that it was in his power to set it aside. Such is the rule of equity; and certainly these blind declarations are not embraced by it. 1 Story's Eq. 338, 9; *Chesterfield* v. *Janssen*, 2 Ves. 125; and see *Butler* v. *Haskell, supra,* where the authorities on this head are collected and reviewed.

We think the complainant has made out a case which entitles him to relief; but we have been greatly embarrassed, as to the mode of administering it, by the frame of the bill. There is no offer on the part of the complainant to reconvey the land, and rescind the contract; nor does he show any excuse for not making the offer. We do not know whether the complainant still holds the land, or whether he has aliened it. Had this defect in the bill been objected to by demurrer, or perhaps even in the answer, it would have been fatal. But as *Malin* has passed this matter by without objection, and submitted the cause to a final hearing on its merits, he is bound to abide the issue. We must adopt the only mode of relief in our power. There is evidence in the record that the land, which the complainant received in part satisfaction of the price of the legacy at 3,100 dollars, increased after the sale greatly in value. *Malin* is, doubtless, entitled to the benefit of this increase. We have come to the conclusion that the land, estimated at its highest value, together with the sum of 1,400 dollars—the difference between the price of the land as fixed by the parties in the contract, and the price of the legacy—may amount to 9,000 dollars. This sum, deducted from the net proceeds of the legacy received by *Malin*, leaves 4,119 dollars and 37 cents, which will be the amount of the decree in favour of the complainant against *Malin;* but owing to the inexcusable frame of the bill, neither interest up to this time, nor costs, will be allowed.

There was no evidence whatever against any of the defendants except *Malin*, and the decree of the Circuit Court as to them is affirmed; as to *Malin* it is reversed.

SULLIVAN, J., having been concerned as counsel in the cause was absent.

*Per Curiam.*—The decree is reversed as to *Malin* and affirmed as to the other defendants; and it is decreed that *Malin* pay to the complainant the sum of 4,119 dollars and

May Term,
1841.

37 cents, with interest from this date; and that the complainant have execution for the same.

J. Dumont, J. G. Marshall, and R. Drummond, for the plaintiff.

J. C. Eggleston, S. C. Stevens, and G. H. Dunn, for the defendants.