June Term, 1861.

Dunn
v.
Amos et al.

---

### Dunn vs. Amos and another.

14    106
54 LRA 447n
54 LRA 452n

Where a man of feeble intellect and intemperate habits, having a power of attorney from B to sell a valuable farm, and declaring his intention to C to sell it only for cash, was encouraged by C to drink until he became intoxicated and unfit for business, and while in that condition was induced by C to convey to him the farm for thirty-three dollars in cash, and a transfer, without recourse, of a contract and mortgage which were of little or no value: *Held*, that the conveyance was obtained by fraud and imposition, and should be set aside.

The defendant in this case having taken no objection to the sufficiency of the complaint by demurrer or answer, and having gone to a hearing on the merits, it was not a fatal objection to the action that the complaint did not allege nor the proof show that the plaintiff had tendered to C before the commencement of the suit, a re-assignment of the contract and mortgage and a repayment of the $33 00.

A fraudulent grantee of land inquired of an attorney at law whether he could give a mortgage on the land so as to prevent his grantor from getting it back, and the attorney advised him not to give a mortgage, but if he did anything, to give a deed. The attorney, by his directions, drew a deed of the land to a third person, and at the time of its execution and afterwards, conversations between the parties to the deed were had in his presence, showing that it was given and received in bad faith. The attorney was not retained generally for either of the parties to the deed, had previously been employed to draw writings for each of them, had sometimes been consulted by the grantor but had only once been paid by him for counsel, and at the time a professional account against the grantor for a few dollars but was not paid for the advice in regard to the deed referred to, and did not charge or expect anything for it, though nothing was said at the time to indicate whether the grantor expected to pay for it or not, and as the parties left the attorney after one of the conversations, one of them told him that he could not say anything about it as he was "an attorney," or "their attorney:" *Held*, in a suit by the owner of the land to set aside said deed, that the attorney was competent to testify to the advice and conversations referred to, although the parties to the deed objected to the disclosure as a breach of professional confidence.

APPEAL from the Circuit Court for *Milwaukee* County.

This action was brought to set aside a conveyance of land in the county of Waukesha, executed to the defendant *Amos* by one Foster as an attorney in fact of the plaintiff, and to set aside also a conveyance of the same land which had been made by *Amos* to his co-defendant *Stimson*, and to compel a reconveyance of the land to the plaintiff. The complaint alleged that the plaintiff, who lived in Kansas, executed a power of attorney authorizing Foster to sell and convey the land, but had made known to Foster his wish that the land should be sold for cash; that in August, 1858, the defendant *Amos* applied to Foster for the purchase of the land, and proposed to pay for it $2,500 in cash; that Foster went to Milwaukee for the purpose of making a deed to *Amos* for the land and receiving the money; that Foster was old, somewhat infirm, and in the habit of using intoxicating liquors, and sometimes drank so much as to be unfit to transact business; that *Amos*, intending to take advantage of the weakness and incapacity of Foster, invited and induced him to drink until he was entirely unfit to do business, and while he was in that condition, fraudulently obtained from him as such attorney in fact, a deed for said

land, without paying him any money therefor, but instead thereof assigned to Foster a certain contract made in November, 1857, between said *Amos* and a firm doing business under the name of Bakeman & Moulton, and a mortgage made by one Ford of Marquette, Michigan, to secure the performance of the contract on the part of Bakeman & Moulton, which contract and mortgage were taken by Foster as collateral security for the sum of $2,500, which said *Amos* falsely represented would be paid by him to said Foster in a few days; that the contract thus assigned was of no value at the time, as said *Amos* well knew; that the assignment was *without recourse*, but that Foster was unable, by reason of his intoxication, to comprehend the meaning of the papers, and that *Amos* fraudulently concealed from him the true force and meaning of the assignment; that after the delivery of the deed *Amos* falsely claimed that the assignment of said contract and mortgage was received by Foster in full payment for the land; that *Amos* has conveyed the land to *Stimson* without consideration, and with notice of the plaintiff's equitable rights; and that the plaintiff has made a tender to said *Amos* of said contract and mortgage, and has demanded from the defendants a release of the rights which they claim to have acquired through the deed executed by Foster; which release they refused to execute. Prayer, that the deed executed by Foster to *Amos*, and the deed made by *Amos* to *Stimson*, be declared void; and that the defendants be compelled to execute a deed of release, &c.

The answers of the defendants denied all the equity of the complaint, and alleged that *Stimson* purchased the land from *Amos*, and received a deed for it, in good faith and for a valuable consideration.

The testimony in the cause was taken before a court commissioner. Wilson Graham, Esq., an attorney, was sworn as a witness for the plaintiff, and testified, among other things, as follows: "In September, 1858, *Amos* had a conversation with me about a farm in Waukesha. Previous to that time I had done little jobs of writing for him, and sometimes he had consulted me about contracts. I was not retained generally as his attorney before or at the time he came

to me. He did not pay me anything for the conversation I had with him at that time. I did not charge him anything, or suppose that I was going to get anything for it. I do not recollect of his offering to pay me anything at that time. He sometimes came to my office and asked me about contracts, and showed me contracts and asked me about their construction. I do not think he paid me more than once for counsel about contracts. I did not make any charge for this counsel at the time. I do not know that he said or did anything at that time different from what he did when he came on business. He came afterwards when he heard I was to be a witness in this case, after this suit had been commenced, and wanted I should make a charge for the counsel, and offered to pay me. It was at the time he paid me for charges I had against him for writing or the commencement of a suit. Then he wanted me to make a charge for this." At this point the defendants objected to the witness giving any testimony as to the conversation had between him and *Amos*. The witness continued: "I think that [at the time of the conversation in September, 1858], *Amos* showed me a power of attorney; I am not sure, but I think it was from Mr. Dunn. It was from a man who had gone to Kansas to a man here, for the sale of a piece of land in Waukesha county. *Amos* wanted to know if that authorized the agent to dispose of the land. I think he said he had traded for the land, and the principal had returned and was not satisfied. I believe I told him that there was some doubt about the power giving him authority to trade or sell except for cash; after that he said he wanted to mortgage the land, or asked if he could not give a mortgage so as to prevent the principal getting it back. I advised him strenuously against giving a mortgage or a deed; but said if he was going to do anything with the land he had better give a deed. He went away and afterwards came back again, the same day or the next day. Before he left the office, the first time or the second, he instructed me to draw a deed. I think the consideration of the deed to *Amos* was $2,400, and we agreed to put this a little more, $2,600. He and *Stimson* came in afterwards together. Before they came, I had drawn notes for

the purchase money. They came in, and the notes were presented to *Stimson*, and he signed them. I think he inquired 'What is this for?' and *Amos* said 'It is the notes;' and I think *Stimson* wanted to know what he was going to do with them. I think *Amos* said he was going to leave them with me. I could not say exactly what *Stimson* said. He said 'Well,' or he 'supposed it was all right,' or something. *Amos* told *Stimson*, as an inducement for him to sign the notes, that he was going to leave them with me. He said I was a safe person to leave them with. I took the notes when signed and locked them up in the safe, telling them that I would keep them safely and would not deliver them till both parties were present. There were three notes, payable in six, twelve and eighteen months, with interest. I have two of them yet [June 8th, 1859]. *Stimson* and *Amos* came to my office, and I delivered the other up on the 4th of January, 1859. There was money delivered by *Stimson* to *Amos*, of sufficient amount, I should think, to pay the note. The amount of the note was one-third of $2,600. I think something was said about what the interest would be up to that time. I was asked to count the money by *Amos* or *Stimson*. I think I commenced counting but did not finish. I saw *Stimson* pass the money to *Amos*. I gave the note to *Stimson*, I think—to one or the other. I did not consider myself the general retained attorney, at that time, of *Stimson*. He was in the habit of coming to me to get his papers drawn. I think he did not give me all his business. Perhaps he gave me all his conveyancing. I was not his general attorney—not specially retained by him. I considered myself a mère conveyancer for him. They did not state to me that they came there to have me act for them as their attorney. I have an indistinct recollection that one of them—I cannot say which one—at the time they were leaving, said that I could not say anything about it, because I was an attorney, or their attorney. I commenced a suit before this time, perhaps a year or two before, for *Amos*. *Stimson* gave me a copy of the summons and complaint that were served upon him [in this cause], and said he would come and see me

about it, but he never came.   I am not his attorney in this cause, unless that is an employment."

Ira Y. Burnham, Esq., as a witness for the plaintiff, testified, among other things, that he drew the deed of the land in question, executed by Foster to *Amos*, and also the assignment from *Amos* to Foster of the contract and mortgage referred to in the complaint; and that before the papers were exchanged *Amos* said to him, "When you read this assignment to the old man [meaning Foster], bear slightly on the words 'without recourse to me." The witness testified, however, that he read the assignment to Foster loud enough for ordinary men to hear, and read the words "without recourse" in the same tone as the rest of the assignment, and that Foster made no objection to it.

The general nature of the rest of the testimony is sufficiently stated in the opinion of the court.

After the plaintiffs' evidence was closed, the defendants moved for a non-suit, and for the dismissal of the complaint, upon the ground that there was no proof of a tender by the plaintiff, before the commencement of the suit, of the money paid by *Amos* upon the purchase of the land, or of a *re-assignment* of the contract and mortgage above referred to. The motion was overruled, and the defendants excepted.

The circuit judge found as facts:   1. That Foster was intoxicated at the time he executed the conveyance to *Amos ;* that he became so intoxicated while in the presence of *Amos* and negotiating the sale of the premises in question on that day; and that the conveyance was improperly obtained from Foster while thus incapable, by reason of intoxication, of making a contract or understanding business transactions.   2. That *Amos* represented the contract and mortgage assigned by him to be of the value of over $2000; that in fact Bakeman, Moulton & Co. had either refused or were unable to perform their part of said contract, and this fact was known to *Amos ;* and that upon this ground the deed must be regarded as having been obtained from Foster either by fraud or mistake.   3. That the defendant *Stimson* was aware of the nature of the transaction between Foster and *Amos*.   4. That the contract and mortgage assigned to Foster were

tendered to *Amos* before this suit was brought, but no tender was made of the amount of *money* paid to Foster at the time of the conveyance.

As a conclusion of law the court held that the prayer of the complaint should be granted, provided the plaintiff should bring into court at any time during that term the contract and mortgage, and the amount of money paid to Foster as aforesaid, to be delivered to the defendant *Amos*. Judgment for the plaintiff accordingly.

*Carpenter & Gridley*, for appellants, contended, among other things, that the failure of the plaintiff to tender to *Amos* so much of the consideration of the deed to him as consisted of money, and his failure to re-assign the contract and mortgage before offering to return them, were fatal to the action, citing *Johnson vs. Jackson*, 27 Miss., 498; *Murphy vs. Lockwood*, 21 Ill., 619; and cases there cited.

*Levi Hubbell*, *contra*, contended that it was sufficient if the plaintiff, when he came into court seeking equitable relief from a deed procured to be executed by fraud, offered on his part to do whatever the court might adjudge to be equitable, citing 1 Wood & Minot, 91; 4 Coms., 483; *Harding vs. Handy*, 11 Wheat., 103; *Morrison vs. McLeod*, 2 Dev. & Batt. Ch., 229, 301; 2 Story's Eq. Jur., §§ 693, 696.

June 18. *By the Court*, DIXON, C. J. We fully concur with the learned judge of the circuit court in his finding of facts in this case. The charge in the complaint that Foster was fraudulently induced to execute and deliver the deed in exchange for the contract and mortgage, when in a state of intoxication, and that his intoxication was encouraged and employed by *Amos* for that purpose, is established by the evidence for the respondent, and not rebutted by that for the appellants. That he was intoxicated seems hardly questionable. It was proved by his own evidence, and although his examination and the general tenor of his testimony show him to be imbecile, still when, as in this particular, he speaks clearly and positively to facts within his knowledge, we can see no reason for disbelieving him. His weakness is acknowledged, but so far as he has ability to state

facts, his truthfulness is not denied. But aside from him, Carrier, Downey and Burnham, with ample means of knowledge, all testify to the same fact. Opposed to them are Warren and D. G. Rogers. Warren, with less opportunity of judging than either of the others, contradicts them. His testimony, however, is not otherwise free from doubt. He says that Foster came to Milwaukee and wanted to negotiate with *Amos* for the contract and mortgage—a statement in which he is contradicted by every fact and circumstance in the case, and not supported even by *Amos* himself. Rogers does not reach the point of positive contradiction. His statements are not absolutely inconsistent with those of the witnesses for the respondent. He says that Foster, at the time of the acknowledgment, appeared stupid, and admits that he may have remarked, about the same, time that "the old man appeared as if he was drunk or half drunk," but qualifies both by saying that he always appeared so to him. This evidence cannot be permitted to outweigh the positive testimony on the other side.

As to *Amos* having connived at and encouraged Foster's intoxication, there is the testimony of Foster himself, corroborated in part by that of *Amos*, and supported by the great leading feature of the transaction, that *Amos*, as he claims, obtained a conveyance of the farm in consideration of the transfer of a contract and mortgage which the proofs show to have been of but very little or no value, when the whole circumstances, aside from the statements of *Amos* himself and perhaps the witness Warren, clearly enough demonstrated that Foster intended to sell only for cash. He knew Foster's habits—that he was weak and easily tempted. He invited him to Milwakee, and when there, and both before and pending the negotiation which was then set on foot, they visited saloons and drinking places, and treated and drank together, and while Foster was so intoxicated as to be incapable of business, the trade was consummated and the necessary papers executed and delivered. This he in part admits; he says they drank once or twice; Foster says several times; the number he cannot recollect. As the result of this fellowship, it appears that the respondent parted

with a valuable farm for a contract and mortgage worth nothing in market, when Foster, the agent, supposed he was to receive a fair price in cash. In reasoning from effect to cause it is difficult to see how *Amos* is not to be held responsible for Foster's drunkenness and consequent incapacity and how it was not a part of the means resorted to by him for the purpose of accomplishing this end.

That Foster intended to sell for money only, and that *Amos* knew it, are not only shown by the testimony of Foster and the extraordinary circumstances under which the trade was closed, but confirmed by the appellants' witness Paggert, who, though evidently introduced for the purpose of showing that Foster agreed to take the contract and mortgage, fails to do so, but says that when they were proposed, Foster said "he would not trade, as he wanted the money." This he states clearly and explicitly. He likewise confirms Foster's statement as to the cash offer which he said he received for the farm. The residue of his testimony, composed as it is of fragments of the conversation caught as he was walking through the garden and elsewhere, and most of the time not within hearing of the parties, is of very little weight. To these may be added *Amos's* admission and promise to *Dunn* to pay him the money, made without claim that the contract and mortgage were made and delivered in payment, as testified by *Dunn* and Foster; his request to Burnham to pass lightly over the important words of the assignment, and his subsequent transfer of the farm to *Stimson* for the purpose of delaying and defeating the equitable rights of the respondent.

The testimony of Graham was properly received, and being so, it is conclusive that the deed to *Stimson* was a mere shift, and void as against the respondent.

Upon the facts, therefore, we are of opinion that the deed was obtained by fraud and imposition, practiced in the manner set forth in the complaint, and that the respondent is entitled to the relief demanded. It was obtained by the artifices of *Amos*, without the payment of the true consideration for which the land was to be sold. Whether the contract and mortgage were good or bad is therefore immaterial

in this view of the case; but as we have already said, they were proved bad, and hence *Amos's* anxiety to get rid of them.

It is said by the appellants' counsel to be a fatal objection to this action, that the money paid in part consideration was not paid or tendered back before the action was brought, and that the contract and mortgage were not re-assigned before the respondent offered to return them. The authorities cited to sustain the objection are inapplicable to this case. They are cases where actions were brought to rescind contracts fairly obtained, on account of some subsequent breach or failure to comply with their conditions. This action was brought to set aside the contract because it was obtained by fraud, and therefore never was the contract or conveyance of the plaintiff. In such case we think it sufficient that the party perpetrating the fraud is left to the care and protection of a court of equity, and that it should be regarded as his fault that he did not seek the injured party and offer to restore that which had been lost through his own iniquity, rather than the fault of the other that he did not request him to do so, and offer to return that which came innocently into his hands. *McCormick vs. Malin*, 5 Blackf., 533.

It follows from these views, that the judgment of the circuit court must be affirmed, with costs.