May Term, 1855.

PETER
v.
WRIGHT.

---

## PETER *v.* WRIGHT and Others.

When a party designedly produces a false impression, in order to mislead, entrap, or obtain undue advantage over another—in every such case there is fraud—an evil act and an evil intent.

When a party to a contract places a known trust and confidence in the other party, in a mixed question of law and fact, and acts on his opinion, and the party in whom such trust was reposed misleads him, equity will relieve.

Family settlements, to be held sacred, must be made in good faith. Fraud or circumvention is fatal to them. Such compromises, fairly entered into, are binding, whether the uncertainty arises upon matters of fact or of law. But if the parties are not mutually ignorant, the case admits of a very different consideration, whether the ignorance relate to the facts or the law. Thus a Court of equity will not sustain a family settlement, where, from a mixture of mistake of title, personal ignorance or liability to imposition, agreements, or acts unadvised, or improvident, or made without due deliberation, are entered into. Nor will such compromises be sustained when it is apparent that the parties did not understand their rights, or the nature of the transaction. In all such cases, Courts of equity will hold the settlement invalid, upon the common equitable principle of protecting those who are unable to protect themselves, and of whom an undue advantage is taken.

To justify the rejection of evidence, it must either be contradicted, or improbable, or obnoxious according to some established legal mode of testing truth.

| 6 | 183 |
| --- | --- |
| 124 | 413 |
| 6 | 183 |
| 130 | 276 |
| 6 | 183 |
| 137 | 681 |
| 6 | 183 |
| 152 | 131 |
| 152 | 132 |
| 6 | 183 |
| 165 | 88 |

May Term,
**1855.**

PETER
v.
WRIGHT.

Where, in chancery, the prayer of the bill was that the answer should be without oath, an answer under oath had no other effect than as if without oath.

Where the answer was required to be without oath, a preponderance of testimony in support of the bill was sufficient.

Fraud may be deduced not only from deceptive or false representations, but from facts, incidents and circumstances which may be trivial in themselves, but decisive in the given case of a fraudulent design.

If a person with whom a deed is left as an *escrow*, to be delivered to the grantee upon his performance of a particular act, passes it to the latter, before he has performed such act, such possession of the grantee does not import a delivery.

A purchaser of real estate who buys with notice that the title of the vendor is to be disputed for fraud, is entitled to no consideration in a Court of equity, if the fraud be established.

*Tuesday,*
*May 29.*

ERROR to the *Tippecanoe* Court of Common Pleas.

STUART, J.—Bill in chancery by *Matilda Peter* against *Wright, Brandt* and others, to set aside certain conveyances as fraudulent. The Court denied the relief sought, and dismissed the bill at the costs of the complainant. She prosecutes this writ of error.

Both in the pleadings and the argument of counsel, it is to be regretted that such unwonted asperity has been indulged. There is nothing to distinguish this case from many others in which fraud is charged on the one side and denied on the other.

Divested of extraneous matter, the facts legitimately presented for our consideration are, as briefly as may be, these:

*Joseph Peter* was one of eleven heirs of *William Peter,* deceased, who died some time in 1837, intestate, leaving a large estate, consisting chiefly of lands. Shortly after his death, the heirs made an amicable partition. By this partition *Joseph* was allotted a larger share than the others, because on him was devolved the support of his mother, *Julia Ann Peter.* That share consisted of two hundred and fifty-four acres of land, including the homestead of the late *William Peter.* Under this partition, the heirs executed deeds, and took possession of their respective shares.

It appears that *Julia Ann Peter* released her dower to her son *Joseph,* and took from him a bond dated *May 29,* 1844, whereby he agreed to deliver to *Julia Ann* one-third

of the products of the farm for six years, and afterwards to support her, &c.

In *May*, 1846, *Joseph Peter* died intestate, leaving the complainant *Matilda* his widow, and *Irvin Peter* his only child and heir at law.

At the time of the partition, some of the heirs were minors, others *femes covert*. To quiet title and confirm what had been done, a bill in chancery was filed, in which all the heirs were parties, either plaintiffs or defendants. The result of this amicable proceeding was a confirmation of the partition already made, and deeds ordered by the Court to the heirs respectively. Under this proceeding, the title of the father, *Joseph P.*, was confirmed in the son *Irvin*, by commissioner's deed.

This amicable suit was terminated in 1848. In *March*, 1849, *Irvin Peter* died intestate, leaving his mother *Matilda*, the complainant, his sole heir at law. She thus inherited the share of *Joseph*, her husband, subject to his obligation for the support of *Julia Ann Peter*.

Consisting, as that portion did, of the *Peter* homestead, and now in the hands of one connected with the family only by marriage, it seems to have become an object with the heirs, to place it, if possible, in the hands of some of the family. They, therefore, in *April*, soon after the death of *Irvin*, took measures to buy out *Matilda*, or, if that failed, to test her title by law. In this negotiation, *Wright* was employed as their agent, at a contingent fee of 500 dollars.

In *May*, 1849, *Wright* took with him *Burkhalter*, the husband of one of the heirs, and *Snoddy*, a friend of the family, and by their joint influence and persuasion, succeeded in purchasing, for the other heirs, from *Matilda*, for 1,500 dollars. At that time, the value of the land so purchased was variously estimated at from 4,000 to 5,000 dollars. *Matilda* gave the heirs a title-bond, to convey upon the payment of the money.

Three weeks after the date of the bond, *Matilda* filed her bill in chancery to set it aside, as having been obtained

by fraud. *Wright* and the *Peter* heirs, obligees of the bond, were defendants.

In *September*, 1849, the case was compromised, and the suit dismissed at *Matilda's* costs. In pursuance of this compromise, she deeded to *Wright* for 2,375 dollars cash, and divers other alleged items of consideration, which will be noticed hereafter. The deed was delivered to *Orth*, as an *escrow*, to be delivered to *Wright* upon the payment of the money above named.

That very day *Wright* and the defendant *Brandt* were negotiating about the homestead, and the next day *Brandt* purchased a part of the land for 3,500 dollars. Without any order from *Matilda*, but on the assurance of *Brandt* simply, *Orth* took *Brandt's* note for 1,750 dollars, in lieu of cash; and the deed which he held as an *escrow* was delivered to *Wright*.

In *January*, 1850, *Matilda* filed her present bill to set aside the compromise, alleging that she was induced to make it by fraud. *Wright* and his vendee, *Brandt*, the *Peter* heirs, and two of her former solicitors, are made parties to the bill. The answers are required to be without oath.

The *Peter* heirs are defaulted. *Wright*, *Brandt* and the other defendants answer, denying the several charges in the bill, and denying all fraud, &c.

The whole controversy, therefore, resolves itself into a question of fact, on the weight of evidence.

The *Peter* heirs are charged as confederates. It has been seen that they had severally received their full share of the paternal estate. They had no further claim on the homestead—no shadow of right to *Joseph's* share, as inherited by *Matilda*. Their position, therefore, in employing *Wright* to procure for them *Matilda's* inheritance, either by compromise at an inadequate price, or by law, was aggressive; and in that aggression they were united. They directed *Wright* to use "whatever means he might deem proper and fitting;" to compromise for 1,500 dollars, if he could, if not, to involve her in litigation. He was to have 500 dollars if he succeeded; if he failed, nothing, and to

pay all costs.    If this is not champerty, it has some such similitude.

The contract to this effect is appended in a note for further reference.(1)

On the other hand, *Matilda* was on the defensive.    She was endeavoring to hold what the law had given her. Alone against a number, with even less than the ordinary capacity and shrewdness of her sex in business matters, she is artfully led from one blunder to another, till her property is gone for a very inadequate consideration.    Thus situated, she appeals to the Courts to relieve her from contracts into which she alleges she has been induced to enter by fraud.

All the parties to the bill in chancery to set aside the title-bond, are also parties to this bill to set aside the deed to *Wright*.    The material parts of the former bill are embraced in this; and the special prayer is for relief against the bond as well as against the deed.    The bond and deed are treated as parts of a whole, and the evidence addressed to both accordingly.

To determine accurately the respective rights of the parties, it will be necessary to examine—

1. The validity of the title-bond to the *Peter* heirs.

2. The validity of the deed to *Wright*.

Incidental to these, there are several other questions which will be noticed as they arise.

First, then, the title-bond executed by *Matilda Peter* to the *Peter* heirs in *May*, 1849.

It has been seen that *Irvin Peter* died in *March*, 1849. The very next month, *April*, 1849, *Wright* was employed. He immediately took with him *Burkhalter* and *Snoddy*, to second his overtures of purchase with *Matilda*.    This part of the transaction is best told by the witness; premising, as it appears in evidence, that *Wright*, *Snoddy* and *Matilda* were all members of the same communion, and that she, therefore, placed the most implicit confidence in these advisers, who had generously come, as they said, to prevent a family difficulty.    *Snoddy*, in substance, says : " Dr. *Wright* and *Henry Burkhalter* called on me and wished me to go with them to Mrs. *Peter's*.    We talked about

her title.   I became convinced that *Matilda's* title was that of *Joseph Peter;* but I always supposed *his* title defective.   I told *Matilda,* in the presence of *Wright* and *Burkhalter,* that I thought her title was not good, and that she had better take the 1,500 dollars, and escape the litigation threatened her by the *Peter* heirs.   I was in utter ignorance, then, that there had been judicial proceedings to supply the deficiency of *Joseph's* deed.   Neither *Wright* nor *Burkhalter* informed me that I was in error, though *Wright* had then papers which I afterwards understood to be copies of the records.

" Had I known of the proceedings in Court, I should not have advised her to take 1,500 dollars."

There was policy, at least, in the selection of *Snoddy,* who, ignorant of the facts, was eager to enact the peacemaker; and in whose integrity and friendship *Matilda* had the most undoubting confidence.   Advice from such a man might well have misled a stronger mind.   He was backed by *Wright,* another brother in the church, and *Burkhalter,* her brother-in-law.   Thus beset, and with such advisers, *Matilda* signed the bond in controversy.   Having thus sold her property for one-third its value, to avert threatened litigation, the object of the confederacy was accomplished.

In what light the law views such transactions, remains to be seen.   In *Smith* v. *Richards,* 13 Peters 26, it is, says Judge *Barbour,* an ancient and well-established principle, that whenever *suppressio veri* occurs, it is sufficient to set aside a conveyance.   Judge *Story* expresses the same thing thus :  " Where a party designedly produces a false impression in order to mislead, entrap, or obtain undue advantage over another—in every such case there is fraud;—an evil act with an evil intent."   1 Story Eq. Jurisp. 201.   Thus, what *Snoddy* ignorantly stated as to the defect of *Matilda's* title, was knowingly and wrongfully adopted by *Wright,* and, as the evidence shows, artfully urged upon her as an inducement to accept the 1,500 dollars.   She placed a known trust and confidence in her advisers, in a mixed question of law and fact, and they misled her.   1 Story Eq. ss. 130, 131, 133.—*Shaeffer* v. *Sleade,* 7 Blackf. 178.—

May Term,
1855.

PETER
v.
WRIGHT.

*The State* v. *Holloway*, 8 Blackf. 45. Nor is this such a family settlement as the books say will be held sacred. Such settlements, to be so upheld, must be made in good faith. Fraud or circumvention is fatal to them.

Thus it is held by judge *Story* that compromises fairly entered into are binding, whether the uncertainty arises upon matters of fact or of law. But if the parties are not mutually ignorant, the case admits of a very different consideration, whether the ignorance relate to the facts or the law. Thus a Court of Equity will not sustain a family settlement where, from a mixture of mistake of title, personal ignorance or liability to imposition, agreements or acts unadvised, or improvident, or made without due deliberation, are entered into. Nor will compromises be sustained when it is apparent that the parties did not understand their rights or the nature of the transaction; as if the heir surrender an unimpeachable title without consideration. In all such cases, Courts of Equity will hold the settlement invalid, upon the common equitable principle of protecting those who are unable to protect themselves, and of whom an undue advantage is taken. 1 Story Eq. Jur., *supra.*

The confederacy of the *Peter* heirs with *Wright* to take advantage of an ignorant woman, and the means resorted to, to consummate the purposes of the confederacy, bring the case before us clearly within the rule laid down by *Story.*

We can therefore have no hesitation in saying that the injurious contract with the *Peter* heirs into which Mrs. *Peter* was drawn, was fraudulent and void.

2. We come, then, to the second question, involving the validity of the deed to *Wright*, and the compromise.

This compromise, which had been advised by counsel, is not altogether an independent transaction. It is a continuation of the confederacy, and tainted in some degree with the fraud which resulted in the execution of the bond. On the part of *Wright*, it was but a revision and adoption of that fraud on his own particular account; for, in the meantime, he had bought out the other defendants.

On the 24th of *September*, 1849, *Julia Ann* and the *Peter* heirs had joined in a quit-claim deed to *Wright* for the whole property pending in chancery. Concurrently therewith he gave his bond to secure *Julia Ann* the benefit of her maintenance bond; or *whatever he (Wright) should consider equivalent thereto;* and to pay all costs, &c.

Two days after, *September* 26th, 1849, *Orth*, in his answer, says, *Wright* called on him, and, on behalf of himself and *the other defendants*, renewed the proposition of compromise made and postponed in *July* on account of the cholera. The next day, *Orth* and *Wright* repaired to *Matilda's*.

It would seem, from the evidence, that both *Matilda* and *Orth* were kept in ignorance of the purchase from the *Peter* heirs. Perhaps, in itself, this piece of secrecy would not be entitled to much weight. It might have inclined *Matilda* to compromise, or it might have had the opposite effect, had she known all the facts. But it assumes importance as a link in the chain of that furtive and faithless policy which marked the negotiations of *Wright*, and gives point to the frauds charged.

Closely connected with the secrecy, is the urgency of *Wright* to complete his contracts. When the bond was obtained, the subject was broached, and the fraud accomplished, at a single sitting. So here. Though the proposition to compromise had been made in *July*, *Matilda* hears it for the first time on the 27th of *September*, 1849, and is then allowed thirty or forty minutes to reflect on it and give her answer. It is worthy of note, too, that a blank deed was brought along; and that *Wright*, without getting out of the buggy, but landing *Orth* at *Matilda's*, hastened directly to *Burkhalter's* for the money, as though it were understood. It was all done in an hour or two, and *Matilda* taken from a sick bed, in a buggy, over the *Clinton* county line, to the nearest magistrate, to acknowledge the deed.

The substance of the advice, on this occasion, is thus given by the witness. "The reasons urged by *Orth* to *Matilda* were about these: That if it were not compro-

May Term,
1855.

PETER
v.
WRIGHT.

mised, it would make a long and tedious law-suit; that the testimony of Mrs. *Peter's* case depended chiefly on the evidence of Mr. *Snoddy* and her brother; that one or both might die before the case was settled, and that she would then stand a poor chance of gaining it. *Orth* said to *Matilda* that she knew her health was bad, and she might not live to get any good of it or to see it settled. The first *Orth* said about the compromise was, that we met together last night, and consulted *Matilda's* case some three or four hours, and we came to the conclusion the best she could do would be to compromise. When *Orth* said that they had concluded that was about the best thing she could do, *Matilda* replied, 'If you can't see any better way, I can't.'"

Now, it is to be observed of this advice, that it came clothed with the authority, not of *Orth* alone, but of his associate counsel. "*We* consulted some three or four hours;" "*we* concluded," &c. The most favorable interpretation of who is meant by "*we*" is, that it was her solicitors. In point of fact, this does not seem to be strictly correct. For in his answer to the charge of such concurrence, made by way of cross bill, *Gregory* positively denies that he had ever been consulted as to the terms of the compromise, and insists that it was settled without his advice. There is no evidence tending to establish the facts thus denied. Further to evince his utter repudiation of it, *Gregory* returned his part of the fee into Court, and actually engaged as associate counsel to set the deed to *Wright* aside for fraud.

It is further to be observed of this advice, that one of the reasons urged why she should compromise, viz., the danger of her witnesses dying before the suit was terminated, though well calculated to impress a woman's inexperienced mind, was very evidently unsound and illusive. For under the practice in chancery in 1849, the evidence was wholly by deposition. The bill was filed in *May*, 1849, and the depositions might have been taken at any time after the subpœnas had been served thirty days, &c. R. S. 1843, p. 842. The diligence of counsel might have

placed all contingencies out of the question, by taking the depositions of *Snoddy*, &c., long before the advice was given. Besides, such advice, for such reasons, was equally applicable before suit was brought, and before expenses were incurred.

One useful corollary, however, flows from this advice, that if *Snoddy* and her brother lived to testify, *Matilda* had a clear case against *Wright* and the *Peter* heirs, in relation to the fraudulent title-bond.

That advice was well calculated to produce, and did produce, a wrong impression. It induced her to accede to a compromise, however, injurious to her interests. Hence the bewildered woman's reply—"if *you* can't see any better way, *I can't.*"

It is no part of our purpose, nor does it lie in our way, to inquire why this advice was given. From whatever motive, it is clear that her mind was thereby bewildered and misled. It is the erroneous impression produced, and the results that flowed from it, with which alone we have to deal. Adopting the language of this Court on a similar occasion, only changing the names—"Even admitting that *Orth* produced the false impression innocently, by mistake—a supposition which his fair general character, perhaps, renders no more than just to him—this consideration does not prevent the application of the principle." *McCormick* v. *Malin*, 5 Blackf. 509. Much more if misrepresentations were knowingly made and injury resulted, will the law imply a fraudulent intent. *Foster* v. *Charles*, 6 Bing. 396.

It is urged that this part of the case depends chiefly on *Neyhart's* evidence. Hence an elaborate effort is made to break its force and discredit it. But the basis assumed, viz., the contradictory matter to be found in the answers of *Wright* and *Brandt*, is novel and unauthorized. If they could discredit this witness, they should have done so by some of the known modes of impeachment. His general character for truth was not questioned. No attempt was made to show that he had given a different version at any other time. Nor did the most rigid and skilful cross-

examination by numerous counsel in succession elicit any contradiction. The slight discrepancies between his evidence and that of other witnesses, are no more than may be found wherever men of different capacity and different powers of observation and habits of thought undertake to narrate the same events. Such discrepancies tend as often to confirm as to impair the credibility of a witness. To justify the rejection of evidence, it must be either contradicted, or improbable in itself, or obnoxious according to some established legal mode of testing truth. Thus regarded, *Neyhart's* evidence will bear favorable comparison with other witnesses.

In this connection, it is proper to notice the rule of evidence applicable to the case. The answers of *Wright* and *Brandt* are put in under oath. But this does not change their legal effect or require any higher evidence. For the prayer of the bill is that they answer without oath. Hence in this as in other civil cases at law, a preponderance of evidence is sufficient.

It appears that concurrently with the deed, *Wright* executed to *Matilda* and delivered to *Orth*, as an *escrow*, a bond of indemnity, the terms of which may throw some light on the good faith of *Wright*. After reciting that whereas the personal property of *Joseph Peter*, deceased, is insufficient to pay the debts, which are thus a lien on the real estate; 2. That *Julia Ann's* bond for maintenance is also a lien; 3. That *Matilda* owes a note of 65 dollars to the administrator of her husband; 4. That *Matilda's* deed to *Wright* warrants against all incumbrances: therefore, *Wright* and his heirs release *Matilda* and her heirs from those covenants, to the extent embraced in the recitals, and agree to save her harmless.

This bond, though not noticed by counsel on either side, seems very suggestive. Is it, for instance, a paper entitled to record? How far would it be notice to subsequent purchasers of the modifications of the covenants contained in the deed? Could *Wright's* assigns, as distinguished from his heirs, (*Williams* on Real Property, 53,) sue *Matilda* for a breach of those covenants? And what security does it

afford her that *Wright* will save her harmless? If it was intended to secure her, why were not those recitals either embodied in the deed itself and expressly excepted from the operation of the covenants, or their performance secured by mortgage? *Matilda* would then have had some security; as it is, she has none. Nor is it to be supposed that this woman knew or understood a tenth part of the complex bond.

These may seem little things, but they have a meaning. They all favor or tend to favor *Wright*. Thus his release to the *Peter* heirs is without seal. For her maintenance bond, he gives *Julia Ann whatever he shall deem equivalent thereto. Matilda* is entrapped with the illusive bond we have been considering. On *Wright's* part, every paper accruing to him is drawn with the utmost exactitude. Even *Brandt's* 1,000 dollar note is secured by mortgage, and the interest payable annually. Such uniformity of advantage on the part of *Wright*, can not be easily accounted for, consistently with good faith.

In cases like this, of numerous and complicated facts, the fraud which should vitiate is generally sought in vain in any one phase of the case. It lurks almost intangibly in the whole transaction. It may be deduced, says *Kent*, not only from deceptive or false representations, but from facts, incidents and circumstances, which may be trivial in themselves, but decisive evidence in the given case of a fraudulent design. 2 Kent 484. Hence the significance of all the little advantages so uniformly in favor of *Wright*, at the expense of those with whom he is dealing.

In this light, the details of the compromise give further color to unfavorable inferences. It is insisted that what she was to receive under the compromise was the full value of the land. That sum is made up thus:

| | |
|---|---:|
| *Brandt's* note, | $1,750 |
| Her solicitor's fee, | 525 |
| Indemnity against the bond to *Julia Ann*, | 1,500 |
| Assumption of the debts of her husband's estate, | 500 |
| Her own note to the administrator, | 65 |
| | $4,340 |

This estimate is taken chiefly from the proposition submitted by *Orth* to *Matilda*, as given in evidence, and from *Wright's* bond. It is, in substance, this: *Orth* said he had got them up to 2,300 dollars. We concluded to throw off 50 dollars of our fee, which would leave *Matilda* 1,750 dollars. He then said they were to pay her note of 65 dollars, given to the administrator. The personal estate of *Joseph* would not be sufficient to pay the debts by perhaps 500 dollars. Elsewhere in the evidence, the maintenance bond to *Julia Ann* is estimated at 150 dollars a year, and the probabilities of life at ten years, making 1,500 dollars—in all, 4,340 dollars.

The answers of *Wright* and *Orth* admit that the 2,375 dollars was to be cash. A tender of *Brandt's* note for part of that sum was no discharge of *Wright's* contract. Such a proposition needs no authority.

It is said that *Matilda* had so agreed with *Brandt*. But it is not proved. *William Brandt*, the son, testifies that *Neyhart* told him so, but that is no evidence against *Matilda*. *Ashby* has it that *Matilda* agreed to wait with *Brandt* till he got ready. *Ohr* that she had sold to *Brandt;* that *Wright's* name was not mentioned. The honesty of all these witnesses may be admitted; but it is clear that their attention and memory are not to be trusted. It is not pretended that there was any memorandum in writing, or any consideration for the alleged promise of *Matilda*. If, therefore, such an understanding were proved, it would be but a *nudum pactum*.

The surrender of the deed to *Wright* has been already alluded to in another connection. Knowing, as he did, that the deed was delivered to *Orth* as an *escrow*, *Wright's* possession of it, under the circumstances in which it was obtained, imports no delivery. In legal contemplation, it was never delivered. The estate still remains in *Matilda*. *Jackson* v. *Catlin*, 2 Johns. R. 248. Admitting that the acts of *Wright* and *Brandt* imposed upon *Orth*, that does not repair the wrong, nor any the less import fraud, upon *Matilda*. *McCullock* v. *Malin, supra*.

Next in order is the conditional fee of counsel. The

substantial parts of this contract, as applicable to the subsequent facts, are given:

"*May* 16, 1849.    $600.    For value received, I promise to pay *Gregory*, *Orth* and *Brackett* six hundred dollars, and interest from date, without any relief, &c.    The consideration for the above is the employment by me of said *G.*, *O.* and *B.*, as attorneys at law, to prosecute a suit in chancery on a certain title-bond executed by me about the 1st of *May*, 1849, of the farm on which I now reside, and which fell to me as the heir of *Irvin Peter*, deceased.    If the said *G.*, *O.* and *B.* succeed in getting the bond set aside, upon suit for that purpose brought, then I am, upon termination of such suit, to pay the above note and interest; and in case they do not succeed, I am to pay them nothing.    *Matilda Peter.*"

It is not our purpose to allude to this contract further than it seems to bear on the questions involved.    It is not champerty, simply because it is not payable out of the thing to be recovered.    But it falls so clearly within the reason of the law on that subject, that the Courts might perhaps declare it void as against public policy.    It is said that Courts of Equity will give no countenance to contracts which savor of maintenance or champerty, though they may not be within the strict legal limits assigned to these offences.    *Prosser* v. *Edmonds*, 1 Younge and Col. 481.    See, also, 4 Kent 449, note *a*.—1 Hawk. P. C. 84.— *Scobey* v. *Ross*, 5 Ind. 445.

But whatever the law may be touching such contracts, it is very clear, for other reasons, that the payment of this conditional fee by *Wright*, cannot be regarded as a part payment to *Matilda* on the land.    For the cash payment of 2,300 dollars, though composed of two items, viz., 1,750 dollars to *Matilda*, the residue to her attorneys, was yet an entirety.    The payment of the latter was not sufficient. To have entitled *Wright* to a delivery of the deed, both sums should have been paid.    That was essential before the payment of any part to *Orth* could be regarded as a payment to *Matilda*.    The one payment, without the other, was not only no payment to her, but in connection with

*Wright's* possession of the deed, was in direct derogation of her instructions and interests.

Even if the validity of the conditional fee be admitted, the 525 dollars being a prominent element in a compromise tainted with fraud, its payment, being made in fraud of *Matilda's* rights, could not be supported in equity. *Chesterfield* v. *Janssen,* 2 Vesey 125.

So that the claim of *Orth & Co.* must be determined by the original contract. That instrument, it will be seen, is very explicit. It is only on the successful termination of a suit brought to set aside the bond that they are entitled to 600 dollars and interest. Unless successful, and in that way, she is to pay them nothing. The bill had been filed; but the chief labor of the case, the depositions and argument, aside from the contingency of success, was yet to come, so far as appears here.

In no sense, therefore, could they claim anything under the contract. They could only come in under the doctrine of *Lomax* v. *Bailey,* and sue *Matilda* for the value of what they had done.

The next item is the 65 dollar note, which *Wright* was to pay. *Daniel Peter,* the administrator, and one of the defendants, is examined as a witness. He testifies that he called on *Matilda* and urged the payment, some months after the compromise, and that she paid the note accordingly.

The next item is the maintenance-bond of *Julia Ann Peter.* That was estimated at 1,500 dollars. But this is clearly extravagant. In the first place, *Burkhalter,* her son-in-law, testifies that she is sixty-five or seventy years old— nearer seventy. Now it may be doubted whether the probabilities of life for a woman of that age, in this climate, are not nearer five than ten years.

In the next place, *Wright* himself has fixed the annual value of the bond. His contract with *Julia Ann* was to secure her rights, under that bond, or *what he should consider equivalent thereto.* That equivalent we find in his co-defendant, *Burkhalter's,* deposition, was the interest on *Brandt's* 1,000 dollar note. Here, then, *Wright* himself has

fixed the annual value of the bond at 60 dollars. He can not complain if the same value is put upon it in the purchase from *Matilda* which he puts upon it in his dealings with *Julia Ann.* As to him, at least, it is an eminently equitable criterion. Taking 60 dollars for ten years, what was counted to *Matilda* in the compromise at 1,500 dollars, was, *Wright* himself being judge, worth 600 dollars.

The last item is the debts of *Joseph Peter's* estate. In the overtures to *Matilda,* they were estimated at 500 dollars, which were to be paid by *Wright* as part consideration on the purchase. But the administrator, *Daniel Peter,* having acted as such four years, and speaking with a full knowledge of the condition of the estate, testifies that the personal property will nearly, if not quite, pay all the debts.

Such are a few of the *indicia* of fraud and circumvention which the case made in the bill, answers and depositions presents. We are, therefore, equally clear on the second point, viz., that the deed to *Wright* is fraudulent and void.

*Brandt's* position is well defined. He was a purchaser with full notice. He went to see *Matilda* before he purchased, and both by her and others he was warned of what was coming; that she intended to contest the deed as soon as she was able to go to town. *Brandt* said, " he did not think he would buy the place, for he did not wish to buy trouble." He purchased the homestead the next day for 3,500 dollars, leaving in *Wright's* hands still eighty acres, worth 1,000 dollars.

Being thus a purchaser with notice, *Brandt* is not entitled to any consideration in a Court of Equity.

*Per Curiam.*—The decree of the Court of Common Pleas is therefore reversed, and the cause remanded to the *Tippecanoe* Circuit Court, with instructions to that Court to enter a decree in this cause in favor of the complainant, *Matilda Peter,* to the following effect, viz. :

1. That her said bond to *Daniel Peter* and others, and her said deed to *Wright,* are found to be fraudulent, and

therefore declared void; and that they be given up to be cancelled, within thirty days.

2. That the title to the said several parcels of land in the bond and deed described, and also described in the bill, [here they were described,] and every part thereof, be vested in the said *Matilda*, as fully as though said instruments had not been executed.

3. That the said defendants, *Wright*, *Brandt* and the *Peter* heirs, [here their names were inserted,] be each of them perpetually enjoined from claiming or setting up any right or title whatever by virtue of said deed and bond, or either of them.

4. And that the costs in the cause be adjudged against the said defendants, *Wright* and the heirs of *William Peter*, deceased, above named.

*D. Mace* and *W. C. Wilson*, for the plaintiffs.

*J. Pettit*, *S. A. Huff*, *Z. Baird*, *G. S. Orth*, and *E. H. Brackett*, for the defendants.

(1) The following is the agreement referred to in the text:

"This article of agreement made and entered into this 28th day of *April*, 1849, between," &c., naming all the *Peter* heirs except *Matilda Peter*, "of the first part, and *Isaac H. Wright*, of the second part, witnesseth, that the said parties of the first part jointly and severally appoint *I. H. Wright* as their agent and attorney, for them and in their behalf and stead, to use whatever means he may deem proper and fitting to have set aside a certain decree in chancery," setting out the substance of the decree of partition among the *Peter* heirs. "Should a suit at law or equity be necessary to finally settle the matter, said *Wright* is to procure such legal counsel and aid as he shall think proper, and to pay all costs and expenses in the case that may properly fall on the party above named," viz., the *Peter* heirs. "The said parties shall each and every one give to said *Wright* such papers and instructions as he may demand, and that may be in their possession and reach. But if said *Wright* shall be able, either with or without suit, to effect a compromise with *Matilda Peter*, widow of *Joseph Peter*, deceased, to such effect as that she will assign all her right, title, claim and demand, both equitable and legal, of, in and to the estate of *Joseph Peter*, deceased, both real and personal, to them, the above-named parties of the first part, jointly to their heirs and assigns, then the said *Wright* is authorized to stipulate with the said *Matilda* to pay her, upon the execution of the deed, the sum of 1,500 dollars, to be paid in joint and equal shares by each of the above parties, each the sum of 150 dollars, making in all the sum of 1,500 dollars. In consideration of the above services by *Wright*, each of the above-named parties do this day execute to *Wright* their note for 50 dollars, due three months after date; and in case *Wright* performs the services above named, and

either sets aside the decree or effects the compromise with *Matilda*, then said notes will be due and payable on the date named, or whenever the decree shall be finally set aside. But in case said decree can not be set aside or said compromise made, then said notes shall be null and void; and all the costs and trouble in the case shall be at the expense of said *Wright*, without recourse on either of the parties of the first part." Then follow, after some repetition, the names of all the *Peter* heirs, except *Matilda*, and *Wright's* name also—all under seal.

In a memorandum at the bottom, five of the heirs unite in authorizing *Wright* to give *Matilda* 2,000 dollars, by way of compromise.