Nov. Term,
1855.

MARSHALL
v.
BILLINGSLY.

character as bridge builder, and another as road builder, or that there is any different liability as to one or the other.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*J. D. Howland*, for the appellants.

*G. Holland*, for the appellees.

---

MARSHALL and Another *v.* BILLINGSLY and Another.

That a note and mortgage were procured by fraud, may be set up as well in a suit by an assignee as in a suit by the person to whom they were made.

Where a party enters into a contract, upon an inadequate consideration, under circumstances of pecuniary embarrassment, and weakness of mind occasioned by habitual drunkenness, and the person with whom he contracts is enterprising and sagacious and takes an unconscientious advantage, a Court of equity will set the contract aside.

A person who, with his eyes open, purchases property at a price greatly exceeding its value, can not obtain relief in equity on that account; but when the purchase, at such price, is a mere condition to the obtaining of a loan, equity may grant relief.

*Thursday,*
*December* 13.

APPEAL from the *Dearborn* Circuit Court.

GOOKINS, J.—Bill in chancery by *Billingsly*, as the assignee of *Major*, against *W. T. Marshall*, the mortgagor, and *Heathy Marshall*, his grantee of the mortgaged premises, for foreclosure. The mortgage was given to secure the following notes, dated *August* 7, 1849, one for 200 dollars, due one year after date, one for 235 dollars and 32 cents, and another for 258 dollars and 72 cents, both due three years after date, and all drawing interest from date. The mortgage was of a half-section of land. The bill is in the usual form. Certain junior incumbrancers were made parties; but as no questions in reference to them are made in this Court, they need not be further noticed.

*W. T. Marshall* answered, admitting the execution of the notes and mortgage to *Major*, but saying they were obtained from him by fraud, and setting up incapacity from drunkenness, as a defence. His original answer and amendment, which are made a cross-bill against *Billingsly* and *Major*, make the following case: That being embarrassed with debts, he applied to *Major* for his services in negotiating a loan, who endeavored to procure it, but without success; that *Major* then proposed to sell him two notes he held against *Hume* and *Logan*, dated in *August*, 1839, each for 159 dollars, besides interest, and, on condition that he would buy said notes, proposed to lend him a small sum; that he accepted the offer, and took an assignment of the notes of *Hume* and *Logan*, without recourse, which, with a small sum of money and a note of *Major's* for a small amount, constituted the only consideration of the notes mentioned in the mortgage; that *Major* represented *Hume* and *Logan* to be solvent, knowing they were worthless; that he knew, also, that the defendant *Marshall* was embarrassed with debts, and that he was not in a situation to buy notes, but that he would not have lent him any money except on the condition of his buying said notes; that he took advantage of his embarrassments, and of his incapacity from habitual drunkenness to transact business safely, to sell him said worthless notes, and to obtain an unlawful and usurious consideration for the use of money, and an unconscionable advantage of him. He admits his sale of the mortgaged premises to his mother, *Heathy Marshall*. He brings into Court the notes of *Hume* and *Logan*, and offers to return them to *Major*.

The answer and cross-bill of *Heathy Marshall* make substantially the same case.

In answer to the cross-bills, *Billingsly* says he knows nothing of the original transaction, and says the notes were assigned to him upon a valuable consideration, which is not impeached. Under our statute, however, the notes and mortgage are open to the same defence as if they had not been assigned.

*Major*, in his answer to the cross-bills, admits that *Marshall* applied to him to borrow money. The amount sought was 1,500 dollars. He says he informed *Marshall* that he had no money to lend; that he endeavored, without success, to procure a loan for him. He denies any particular knowledge of the nature and extent of *Marshall's* embarrassments; says he spoke of some small debts, but the particular use he wished to make of the money was to enable him to get out stone and timber, of which he had an abundance on his farm, which lay upon the canal, to carry to market. He states the consideration of the notes mentioned in the mortgage to be 200 dollars, a part of which he paid at the time, and for the residue he gave his note, which he paid to *Marshall's* assignee soon after; and the two notes he held against *Hume* and *Logan*. He admits that *Marshall* had not, as he presumed, money with which to buy notes, and that he would not have loaned him the 200 dollars, except upon condition that he would purchase the notes of *Hume* and *Logan*, but denies that he first proposed to sell him said notes. He says that in conversation *Marshall* had informed him that he was acquainted with *Hume*, from whom he had learned of his indebtedness to *Major;* that he·stated that *Hume* was good, and had property, and that said debt could be collected. He states that he told *Marshall* that he had supposed *Hume* to be insolvent, and that *Logan* had gone to *Arkansas;* that he had heard that he was supposed to be solvent, but that he did not know where he was; that he further stated to *Marshall* that he had once commenced suit against *Hume*, but having heard that he intended to rely upon the defence of infancy at the time of giving the note, he withdrew the suit; that *Marshall*, in answer to this, assured him that he was well acquainted with *Hume;* that he had a house and lot in *Cincinnati*, worth some 3,000 dollars, and that the money could be made out of him in a short time; whereupon he proposed to sell him the notes at the amount then due upon them, payable three years after date with interest, and to assign them without recourse, and to loan him

200 dollars, and take a mortgage for the whole, which was done; that at the close of the transaction, *Marshall* boasted that he would collect the notes from *Hume* within three months. He denies having taken any more than lawful interest, and denies that *Marshall* was incapable from drunkenness to transact business, but says he was fully competent. The answers are put in under oath, as required by the bill.

All the answers, on both sides, were put in issue by replications.

. The following facts we conceive to be established by the proofs.

In the summer of 1849, *W. T. Marshall* applied to the defendant *Major*, residing at *Lawrenceburgh*, to negotiate a loan for him of about 1,500 dollars, for the ostensible purpose of carrying on the business of getting out timber and stone upon his farm lying on the canal, to be sent to market. *Major* endeavored to procure the loan, without success. *Marshall* visited *Lawrenceburgh* three times on this business. On his first visit he was accompanied by one *Hume*. On being inquired of by *Major* who this person was, *Marshall* informed him that it was *Hume*, who did not wish to be recognized by *Major*, fearing the latter might sue him upon some notes he held against him. This incident seems to have led to a negotiation between *Major* and *Marshall*, which resulted in the loan by the former to the latter of 200 dollars, and the purchase by *Marshall* from *Major* of two notes he held against said *Hume* and one *Logan*, dated in *August*, 1839, one of which, with interest, then amounted to 235 dollars and 32 cents, and the other to 258 dollars and 72 cents, for which several amounts *W. T. Marshall* executed to *Major* the mortgage sought to be foreclosed, dated *August* 7, 1849, payable in one and three years from date, with interest from date; and *Major* assigned to *Marshall* the notes of *Hume* and *Logan*, without recourse. *Major*, at the time of the transaction, told *Marshall* that he had supposed that *Hume* was not good, and that *Logan* had left the country some years before and gone to *Arkansas;* that he had heard a

Nov. Term, 1855.

MARSHALL
v.
BILLINGSLY.

report that *Logan* was good, but did not know where he was. *Marshall* expressed the opinion that the money could be made off of *Hume*, who, he said, had a house and lot in *Cincinnati* worth 3,000 dollars. *Major* was aware that *Marshall* had not money with which to buy notes; and he would not have loaned the 200 dollars to *Marshall*, except upon condition that he would buy the notes of *Hume* and *Logan*. *Marshall* got 80 dollars, at the time saying he wanted a little money to pay off a judgment and some other small debts. For the residue, *Major* gave his due-bill, which he afterwards paid to *Marshall's* assignee. During the negotiation, *Major* informed *Marshall* that he had once brought suit against *Hume* on the notes; that *Hume* set up the defence of infancy; and that fearing he would prove it, and for the purpose of making inquiries, he dismissed the suit. It also appeared in evidence that *Hume* was a minor when the notes were given, and that they were not given for necessaries.

For ten or fifteen years before the giving of the mortgage, *W. T. Marshall* had been a habitual drunkard. There was a preponderance of evidence that about the time of this transaction, he was capable of transacting business when not intoxicated. During his visits to *Lawrenceburgh* to procure money, he lodged with one *Hornberger*, an inn-keeper, and paid his tavern bills by orders drawn on *Major*, who paid them out of the 200 dollars loaned. *Marshall*, during these visits, was always drinking, and carried his bottle to bed with him, or had a glass of liquor set at his bedside. In the opinion of *Hornberger*, and of *Kunkle*, his bar-keeper, he was not, during any of said visits, capable of transacting business. *Armstrong*, another witness, stated that in his opinion *Marshall* had been incapable of transacting business for six or seven years.

It was proved that *Hume* was a drunken printer residing in *Cincinnati;* that he died in *October*, 1849, utterly worthless; that he died of a disease of the lungs, brought on, probably, by his irregular habits; that for two years before his death, he had not been able to earn a living, and not

more than that for the two years preceding. He lived in
a house situated upon a lot in *Cincinnati*, which he pur-
chased for 400 dollars about 1840, and on which he paid a
little over 100 dollars. The house was a framed building,
and was erected by *Hume*, at a cost of about 250 dollars.
He soon after sold the property to his father-in-law, *Dowd*,
who, during his life, and his widow after his death, permit-
ted *Hume* to occupy the house until the death of the latter,
free of rent. There were circumstances tending slightly
to show that the property was covered for the use of *Hume;*
but there was no proof that such was the fact. The testi-
mony, so far as it goes, raises a stronger presumption that
he lived there as an object of charity, than that the pro-
perty was fraudulently covered. It further appeared that
in the latter part of *Hume's* life, he and *Marshall* were inti-
mate, and habitual drinkers together.

*Tibbs, Cloud* and *Murdock*, witnesses for the plaintiff,
testified that *Marshall*, in their opinion, was capable, when
sober, of transacting business. They discovered nothing
like insanity about him, and give a few instances of con-
tracts made by him.

*Major* was examined as a witness, at the instance of
*Billingsly*. He detailed the transaction which led to the
taking of the mortgage, substantially as stated in his an-
swer.

In reviewing this case, we have arrived at the conclu-
sion that the mortgage, to the extent of the two notes of
*Hume* and *Logan*, purchased by *W. T. Marshall* from
*Major*, can not be sustained in a Court of equity. It is
evident that those notes had no appreciable value, and
that they were regarded as worthless, or nearly so, by the
holder, at the time he sold them to *Marshall* and indorsed
them without recourse. *Logan* was gone to parts un-
known. The short distance and facilities for intercourse
between *Lawrenceburgh* and *Cincinnati*, connected with
the fact that he had held the notes for ten years, and had
once brought suit against *Hume* upon them, raise a very
strong presumption that *Major* was aware of *Hume's* utter
worthlessness. Indeed, *Major* does not state in his an-

swer, that he believed *Hume* had any property. He pru-
dently states, that from what *Marshall* told him, he be-
lieved that *Marshall* believed he could collect the notes
from *Hume.* If *Marshall* did so believe, with the know-
ledge his intimacy with *Hume* must have given him of his
circumstances, and with the information that he was rely-
ing upon the defence of infancy, which *Major* communi-
cated to him, it goes further to establish the imbecility of
*Marshall,* than any other proof in the record.

We do not think *Marshall's* incapacity from drunken-
ness alone sufficient to avoid his contract; but when a
transaction is characterized by weakness of mind, pecu-
niary embarrassment, inadequacy of price, an enterprising
and sagacious adversary, and an unconscientious advan-
tage, a Court of equity will set the transaction aside.
*Mc Cormick* v. *Malin,* 5 Blackf. 509. We think all these
elements combine in the transaction presented by this
record. *Major* well knew that *Marshall* had not money
to buy notes with, even had they been good. He came to
borrow money. He wants 1,500 dollars to enable him to
get out stone and timber to send to market. His demand
is finally reduced to 200 dollars, to meet some immediate
pressure, of which he gets in hand only 80 dollars; he pays
his tavern bills by orders on *Major,* and yet *Major* admits
that he refused to loan even that sum, except upon condi-
tion that he would purchase the notes. If a man, with his
eyes open, choose to buy property, he may give what price
he pleases, and will apply to a Court of equity for relief in
vain; but this was not a sale of property. It was money
*Marshall* wanted, and the purchase was yielded to by him
as the only means of obtaining a loan. The case of *Col-
lett* v. *Preston,* 15 Eng. Law and Eq. R. 101, in which relief
was granted, was in many of its features like the present.
The most essential difference between the two, is, that in
that case the borrower, without any degree of imbecility
or incapacity shown, was forced by his necessities to pur-
chase property at ten times its value, as the only condition
on which he could *obtain* a loan; while in this case we
find the borrower, with greatly weakened powers of mind,

under the pressure of pecuniary embarrassments, and probably the resistless demands of a depraved appetite, yielding to the purchase of property of no appreciable value, as the only condition of obtaining a loan in no respect adequate to the use to which it was ostensibly to be applied. In these respects the claim for relief is stronger than in that above quoted. *Lawley* v. *Hooper*, 3 Atk. 278, is a very similar case, in which, although Ld. Ch. *Hardwicke* said he would, if necessary, have found the transaction usurious, yet he did not deem it necessary to put the case on that ground, for, independent of it, it was an unconscientious bargain, which he would not allow to stand.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, with instructions to the Circuit Court, to enter a judgment for the plaintiff below for the amount of the 200 dollar note and interest, and a foreclosure of the mortgage for that amount, with leave to the defendant *Major* to withdraw the notes of *Hume* and *Logan*, which were brought into Court with the answer of *W. T. Marshall.*

*P. L. Spooner*, for the appellants.

*D. S. Major*, for the appellees.